UNITED STATES *v.* ANSONIA BRASS AND COPPER COMPANY.

ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF VIRGINIA.

No. 458. Argued October 18, 1910.—Decided November 28, 1910.

Where the United States claimed in an action in the state court to determine liens on vessels in course of construction, that, under the contract, title had vested in the United States, or that liens had been specially reserved thereon, and also claimed that the rights of the United States were superior to all others and could not be retarded or impeded by the state lien law, assertions are made of rights and immunities which are the creation of Federal authority, and, if denied by the state court, this court has jurisdiction under § 709, Rev. Stat., to review the judgment.

Stipulations entered into by the United States district attorney to obtain possession of vessels in course of construction and seized by judicial proceedings under state law should not, under §§ 3753, 3754, Rev. Stat., be construed as depriving the United States of any rights asserted under the contracts for constructing such vessels.

Construing the three contracts for construction of vessels involved in this case, the court construes one contract as vesting title in the United States as the work progressed and the others as not giving the United States a superior lien on the uncompleted vessel as work progressed: in regard to the one contract, the state lien law does not, and in regard to the other contract such law does, apply.

Vessels in course of construction for the United States, the title to which under the contract, vests in the Government as fast as constructed, become instrumentalities of the Government and for reasons of public policy cannot be seized under state laws to answer private claims.

*Quære*, whether a joint resolution has the effect of an act of Congress; but *held* that the resolution of May 5, 1894, No. 24, 28 Stat. 582, permitting partial payments on vessels under construction for the Treasury Department, did not give the Government an express statutory lien on such vessels superior to those given to materialmen by the state lien law.

110 Virginia, 165, affirmed in part and reversed in part.

THE facts, which involve the construction of contracts for the construction of certain vessels for the United States and the relative rights of the United States and others claiming liens on such vessels, are stated in the opinion.

*Mr. Lunsford L. Lewis,* United States Attorney, with whom *Mr. Assistant Attorney-General Harr* was on the brief, for the United States:

Contracts made by the United States are not subject to state registry statutes; the recordation statute of Virginia does not apply thereto. *Dollar Savings Bank* v. *United States,* 19 Wall. 227; *Stanley* v. *Schwalby,* 147 U. S. 508; *United States* v. *Snyder,* 149 U. S. 210.

Title to the unfinished dredge did vest in the United States, under the contract, as the work progressed and was paid for.

As title, under the contract, passed to the United States as payments were made, the subsequent liens in question did not and could not attach to the vessel. *Millhiser* v. *Gallego Mills Co.,* 101 Virginia, 579, 585; *Briggs* v. *A Light Boat,* 7 Allen (Mass.), 287, holding that when property is acquired by the United States, it is taken *cum onere,* has no application. While in general, under a contract for a ship or other thing not yet *in esse* but to be constructed, no

title passes to the vendee before it is finished and ready for delivery, a contrary intent if apparent from the terms of the contract or the attending circumstances, that title shall pass before completion, will be effectuated. . *Clarkson* v. *Stevens*, 106 U. S. 505; *Woods* v. *Russell*, 5 B. & Ald. 942; *Clarke* v. *Spence*, 4 Ad. & El. 448; *Laidler* v. *Burlinson*, 2 M. & W. 602. But see *Wood* v. *Bell*, 5 El. & B.· 772; *Seath* v. *Moore*, 11 App. Cas. 350; *Scudder* v. *The Calais Steamboat Co.*, 1 Cliff. 370, 378; *Andrews* v. *Durant*, 11 N. Y. 35, Parker, J. See also 2 Mees. & Welsb.

The provision requiring the company to give bond with security for its faithful performance of the contract does not create any inference that title was not to vest as payments were made. The bond was no doubt required in order to secure the Government against any damage that might be sustained by reason of failure on the part of the contractor to do the work within the prescribed time or in a proper manner, as, in any other view of the case, the bond was certainly very inadequate security against damage which the Government might sustain on account of its payments or otherwise. *Clarkson* v. *Stevens*, 29 N. J. Eq. 607; *Andrews* v. *Durant*, 11 N. Y. 35; *Williams* v. *Jackman*, 16 Gray, 514; *Briggs* v. *A Light Boat*, 7 Allen (Mass.), 287; and *Clarkson* v. *Stevens*, 106 U. S. 505, distinguished.

As title to the dredge passed under the contract to the United States, the dredge is not subject to the supply-liens in question, and the right to raise this objection was in no wise waived by entering into the stipulation upon which possession of the vessel was surrendered to the Government, under § 3753, Rev. Stat.

Under the state statute, supply-liens can attach only to property belonging to the debtor corporation. *Millhiser &c. Co.* v. *Gallego Mills Co.*, 101 Virginia, 579, 585.

As to the Mohawk, the contract, unlike the Benyuard contract, did not stipulate for title as the work progressed, but for a lien for advances made during the progress of

the work. See joint resolution of Congress approved May 5, 1894, 28 Stats. 582.

When in such a case a lien is reserved the joint resolution operates upon it, and consequently the lien is a statutory lien, and as such, beyond the reach of state legislation. *United States* v. *Snyder*, 149 U. S. 210.

The contract was made with reference to the joint resolution, and Congress in passing the joint resolution did not contemplate that the lien directed to be reserved would be liable to be displaced or overridden by liens of any sort subsequently accruing. While in some States a joint resolution may not have the force of law, as held in *May* v. *Rice*, 91 Indiana, 546, 552; *Burritt* v. *Commissioners of State Contracts*, 120 Illinois, 322, 336; *Boyers* v. *Crane*, 1 W. Va. 176, joint resolutions of Congress do not in their effect differ from bills, and when duly passed have the effect of law. See Art. I, § 7, Constitution U. S.; Cushing, Law & Pr. Leg. Assemblies, 2403; 6 Op. Atty. Gen. 680; see also *Mullan* v. *State*, 114 California, 578, 585.

This joint resolution is not a delegation of legislative power. *Field* v. *Clark*, 143 U. S. 649, 693; 1 Jones, Liens, § 105. The lien of the Government upon the Mohawk is prior to the supply-liens in question, not because of any prerogative right, but because the lien is prior in time; and being prior in time, it cannot be divested or displaced by subsequent liens, although in the joint resolution nothing is said about the priority of the lien.

The contract is to be read in connection with the higher law, to wit, the joint resolution, and not the state supply-lien law, and it is the former and not the latter enactment that "enters into and becomes a part of the contract." *United States* v. *Maurice*, 2 Brock. 96. The power of the United States to contract is coextensive with the duties and powers of government. *United States* v. *Tingey*, 5 Pet. 115; *United States* v. *Bradley*, 10 Pet.

343; *Jessup* v. *United States,* 106 U. S. 147; *Van Brocklin* v. *Tennessee,* 117 U. S. 151, 154; *Moses* v. *United States,* 166 U. S. 571, 586.

The power of the Government to contract is, not less than the power of taxation, a necessary and indispensable incident of sovereignty. *Snyder Case,* 149 U. S. 210, 214. While the States are not expressly prohibited from interfering with the operations of the General Government, the inhibition comes by necessary implication. *Briggs* v. *A Light Boat,* 7 Allen (Mass.), 297; *United States* v. *Fox,* 94 U. S. 315; *United States* v. *Perkins,* 163 U. S. 625; *United States* v. *Bostwick,* 94 U. S. 53; *Southern Pacific Co.* v. *United States,* 28 C. Cl. 77; *Van Hoffman* v. *Quincy,* 4 Wall. 535; *Walker* v. *Whitehead,* 16 Wall. 314, distinguished. See *United States* v. *Thompson,* 96 U. S. 486; *United States* v. *Herron,* 20 Wall. 251; *Commonwealth* v. *Ford,* 29 Gratt. (Va.) 683.

What has been said in regard to the Mohawk equally applies to the Galveston contract. The Secretary of the Navy had the implied power to reserve a lien on the vessel. *United States* v. *Macdaniel,* 7 Pet. 1; *United States* v. *Corliss Steam-Engine Co.,* 91 U. S. 321. Every act of the Secretary did not have to be authorized by statute. *Haas* v. *Henkel,* 216 U. S. 462, and as to power to reserve the lien, see *Van Brocklin* v. *Tennessee,* 117 U. S. 151. See also *Hauselt* v. *Harrison,* 105 U. S. 401; *Burnheisel* v. *Firman,* 22 Wall. 170, 179; *Rorer* v. *Ferguson,* 96 Va. 411.

*Mr. R. G. Bickford* and *Mr. Eppa Hunton, Jr.,* for defendants in error:

The sovereignty of the United States Government is lawful, not lawless. Under a contract with an individual, the rights of the Government and the rights, not remedies, of the individual are precisely the same as if the contract were between individuals. *United States* v. *State Bank,* 96 U. S. 36; *United States* v. *Smith,* 94 U. S. 217; *United*

*States* v. *Bostwick,* 94 U. S. 66; *Mfg. Co.* v. *United States,* 17 Wall. 595; *Smoot's Case,* 15 Wall. 45; *Gleason* v. *Gosnell,* 35 C. Cl. 90; *Southern Pac. Co.* v. *United States,* 28 C. Cl. 105; *Curtis' Case,* 2 C. Cl. 104; *Gilbert* v. *United States,* 1 C. Cl. 28; *858 Bales of Cotton,* 8 Fed. Cas. 389; 29 Am. & Eng. Ency. Law, 170; *McKnight* v. *United States,* 98 U. S. 186; *Fristoe* v. *Blum,* 45 S. W. Rep. 999.

The only difference between the individual and the United States in such contracts is a difference of remedy, not of right. *Brent* v. *Bank of Washington,* 10 Pet. 614; *United States* v. *Bank of Metropolis,* 15 Pet. 392.

It is a sovereign in its power of contract; it is a corporation as to the contract actually entered into. *Jones* v. *United States,* 1 C. Cl. 385. While the United States cannot be sued on its contracts, as that would be an invasion of its sovereignty, it may sue either in state or Federal courts as a corporation or body politic. *United States* v. *Detroit T. & L. Co.,* 200 U. S. 321; *United States* v. *Holmes,* 105 Fed. Rep. 43; *The Davis,* 10 Wall. 22; *Fink* v. *O'Neil,* 106 U. S. 280; *Carr* v. *United States,* 98 U. S. 438; *Mountain Copper Co.* v. *United States,* 142 Fed. Rep. 629; *Walker* v. *United States,* 139 Fed. Rep. 413; *United States* v. *Clark,* 138 Fed. Rep. 299; *United States* v. *Detroit Timber Co.,* 131 Fed. Rep. 677; *United States* v. *Ingate,* 48 Fed. Rep. 253; *United States* v. *Tetlow,* Fed. Cas. No. 16,456; 28 Fed. Cas. 45; 29 Am. & Eng. Ency. of L. 172; 27 Am. & Eng. Ency. of L., 1st ed., 537.

Courts of a State may acquire jurisdiction over the United States by its voluntary submission and incidentally to such submission the United States renders itself liable to the operation of laws of the State of such tribunal. In like manner, the United States may render itself liable to the laws of the State by voluntary contract with persons, and respecting property, subject to state laws. *Ryan* v. *United States,* 136 U. S. 82; *United States* v. *100 Barrels,* Fed. Cas. No. 15,945; *Clifford* v. *United States,* 34 C. Cl.

232; *United States* v. *Ames*, Fed. Cas. No. 14,441; *United States* v. *Crosby*, 7 Cranch (U. S.), 115; *New Orleans* v. *United States*, 10 Pet. 662; *Stearns* v. *United States*, 22 Fed. Cas. 1192; *Briggs* v. *A Light Boat*, 7 Allen, 297; *The Siren*, 7 Wall. 152; *The Davis*, 10 Wall. 19.

The right in private property or under contract, cannot be greater than the right of its grantor. The state statute fully operated before the right of the United States accrued. The Government took *cum onere*, and that was the intent of the parties. *Knowlton* v. *Moore*, 178 U. S. 41; *United States* v. *Perkins*, 163 U. S. 629; *United States* v. *Fox*, 94 U. S. 315; *United States* v. *Buford*, 3 Pet. 29; *Central Trust Co.* v. *Charlotte, C. & A. R. Co.*, 65 Fed. Rep. 259; *In re Merriam's Estate*, 36 N. E. Rep. 506; *Levaser* v. *Washburn*, 11 Gratt. 578; 25 Cyc. 661.

The Government was entitled merely to what the Trigg Company could give, and all that that corporation could give was that which remained of the property, after satisfying the supply-liens. This would be the result in a contract between individuals, and the same result follows though the vessels were to pass to the United States. *Briggs* v. *A Light Boat*, 7 Allen, 296, 297; *McNeal & Co.* v. *Howland*, 16 S. E. Rep. 857; *The Revenue Cutter No. 1*, Fed. Cas. No. 11,713; *The Revenue Cutter No. 2*, Fed. Cas. No. 11,714.

The contract should be construed agreeably with the intent of the parties. Both the Government and the Trigg Company intended that the rights of the Government should be subject to the supply-lien law. This was an actual as well as a legal intent. As to the legal intent, see *Brine* v. *Insurance Co.*, 96 U. S. 643; *Provident Institution* v. *Jersey City*, 113 U. S. 511; *Van Stone* v. *Stillwell*, 142 U. S. 136; *Brent* v. *Bank of Washington*, 10 Pet. 596.

The Galveston contract, which was the first of the three contracts, expressly recognizes that the rights which were

given by the Trigg Company to the United States were subject and were intended to be subject, to the lien laws of the State. Op. Atty. General Griggs, June 21, 1900, cited approvingly in *Penn Iron Co.* v. *Trigg Co.,* 56 S. E. Rep. 329.

There was no common-law lien; the possession of the Galveston remained with the Trigg Company until long after the supply-liens were filed. Therefore the Government did not have a common-law lien. Neither was it a pledge, for here, also, possession passes to the creditor. 3 Pomeroy's Eq. Jur. 2466. The lien, if any, was void as to third persons at common law. 7 Bacon's Abridgment, 181, and there is a preponderance of authority that there is no lien as between the parties themselves. 22 Am. & Eng. Ency. of Law, 853, 854, 855.

As property remained in the Trigg Company, by the express terms of the supply-lien statute, the supply-lienors had the prior right. The United States is entitled to prior liens or rights only where some statute provides for such priority. *United States* v. *Bank of North Carolina,* 6 Pet. 34; *United States* v. *Canal Bank,* Fed. Cas. No. 14,715; 25 Fed. Cas. 278. See also *Conard* v. *The Atlantic Ins. Co.,* 1 Pet. 441; *Briggs* v. *A Light Boat,* 7 Allen, 297; *United States* v. *American Surety Co.,* 111 Fed. Rep. 914; *United States* v. *Heaton,* 128 Fed. Rep. 414; *United States* v. *Detroit Lumber Co.,* 131 Fed. Rep. 668; *C. C. A. U. S.* v. *American Surety Co.,* 135 Fed. Rep. 79.

There is no statute giving priority; therefore, none exists. The joint resolution requiring the Secretary of the Treasury to insert in the contract a provision for a lien neither gives a lien, nor did Congress intend it to have that effect. It clearly contemplates a contractual and not a statutory lien. *United States* v. *Snyder,* 149 U. S. 210, and see 1 Jones on Liens, § 105; 2 Mechem on Sales, § 755; 2 Parsons on Contracts, 8th ed., 259; *Merritt* v. *Johnson,* 7 Johns. (N. Y.) 473; *Andrews* v. *Durant,* 11

N. Y. 34; *People v. Commissioners*, 58 N. Y. 244; *Hall* v. *Green*, 1 Houst. (Del.) 546; *Shaw* v. *Smith*, 48 Connecticut, 306; *Yukon River Steamboat Co.* v. *Brotto*, 136 California, 538; *Williams* v. *Jackman*, 16 Gray, 514; *Low* v. *Austin*, 20 N. Y. 182; *Briggs* v. *A Light Boat*, 7 Allen (Mass.), 287; *Wright* v. *Tetlow*, 99 Massachusetts, 397; *Forsythe* v. *Dickson*, 1 Grant's Cases, 26 (Penn.); *Scull* v. *Shakespeare*, 75 Pa. St. 297; *Lang's Appeal*, 81 Pa. St. 18; *Coursin's Appeal*, 79 Pa. St. 220; *Strong* v. *Dinniry*, 175 Pa. St. 586; *S. C.*, 34 Atl. Rep. 919; *Haney* v. *Schooner Rosabelle*, 20 Wisconsin, 261; *Elliott* v. *Edwards*, 35 N. J. L. 265; *West Co.* v. *Trenton Co.*, 35 N. J. L. 517; *Stevens* v. *Shippen*, 29 N. J. Eq. 602; *Revenue Cutter No. 1*, Fed. Cas. No. 11,713; *Revenue Cutter No. 2*, Fed. Cas. No. 11,714; *The Sam Slick*, Fed. Cas. No. 12,283; *Clarkson* v. *Stevens*, 106 U. S. 505; *The Poconoket*, 67 Fed. Rep. 262; *The John B. Ketchum*, 97 Fed. Rep. 872; see also *Trigg* v. *Bucyrus Company*, 51 S. E. Rep. 175, 176.

The contract is entire and the installment payments were made upon the faith of the complete performance of the entire contract, the doing of all the work, the supplying of all materials.

Giving to the Benyuard contract and specifications the full effect claimed by the Government, the supply-lienors are yet entitled to a claim on that vessel. *Wood* v. *Skinner*, 139 U. S. 293, 295; *Murdock* v. *Memphis*, 20 Wall. 590, 636; Pollard's Code, 1904; *Smith* v. *Howard*, 53 N. E. Rep. 143, 144; see also *Kerr* v. *Moon*, 9 Wheat. 565.

The Virginia recording statutes operate precisely as did the inheritance tax law of New York. See *Knowlton* v. *Moore*, 178 U. S. 41; *United States* v. *Perkins*, 163 U. S. 629; *Ryan* v. *United States*, 136 U. S. 86; *Burbank* v. *Conrad*, 96 U. S. 292, 293; *Stewart* v. *Platt*, 101 U. S. 737; *Montgomery* v. *Wright*, 8 Michigan, 147, 148.

MR. JUSTICE DAY delivered the opinion of the court.

This is a writ of error to the Supreme Court of Appeals of Virginia. The controversy grows out of contracts made between the United States and the William R. Trigg Company, a corporation organized under the laws of the State of Virginia, carrying on business at Richmond, Virginia, for the construction of certain vessels for the United States, namely, a sea-going suction dredge, called the Benyuard, for the War Department; a revenue cutter, called the Mohawk, for the Treasury Department; and a cruiser, for the Navy Department, called the Galveston. The contract price for the Benyuard, apart from its pumping machinery, was $254,550; for the Mohawk, $217,000; and for the Galveston, $1,027,000. These contracts were dated, for the Benyuard, September 9, 1901; for the Mohawk, April 20, 1900; and for the Galveston, December 14, 1899.

In December, 1902, S. H. Hawes & Company filed a bill in the Chancery Court at the city of Richmond, on behalf of themselves and other creditors, asserting liens under the supply-lien law of the State of Virginia, averring the insolvency of the Trigg Company, and asking for the appointment of a receiver, which was accordingly made. The receiver took possession of the property of the Trigg Company, including the vessels above named. Under §§ 3753 and 3754 of the Revised Statutes of the United States a stipulation was executed by the United States district attorney, on behalf of the United States, for the release and discharge of the vessels, and the material on hand applicable thereto.

Thereafter the case proceeded to judgment, and, on final appeal to the Supreme Court of Appeals of Virginia, the liens under the supply-lien law of the State were held superior to any claim or lien of the Government. In the case of the Benyuard, two of the five judges of that court

dissented from the opinion of the majority, holding that the title to the Benyuard had passed to the United States under the terms of the contract under which it was constructed. The case is reported in 110 Virginia, 165.

It is contended that there is no jurisdiction in this court to review the judgment of the Supreme Court of Appeals of Virginia, as no Federal question was decided in that court which would lay the foundation for the writ of error. In the third class of cases provided for in § 709 of the United States Revised Statutes, it is expressly provided that where any right, title, privilege or immunity claimed under the Constitution, treaty or statute of the United States, or an authority exercised under the United States, is specially set up or claimed by either party, and the decision is against such right, title, privilege or immunity, the same may be reëxamined and reviewed by writ of error from this court.

An examination of the record discloses that the Government claimed in the case that under the contract the title to the dredge vested in the United States by virtue of the terms of the contract; that a lien was reserved to the United States under the contract for the cutter Mohawk and the cruiser Galveston, which was superior to the claims of the supply-liens' creditors under the laws of the State of Virginia. The Government further contended that the right of the Government to its superior claims upon the vessels, whether of title or lien, could not be affected by, and were not subject to, the lien statutes of the State of Virginia. The Government also claimed that the State had no power to retard, impede or control the operation of the Federal Government in making and carrying out such contracts as are herein under consideration.

We think that from this statement of the claims made in the court below on behalf of the United States assertions were made of rights and immunities which were the creation of Federal authority, and the denial thereof

by the judgment of the state court brings the case within the provisions of § 709 of the Revised Statutes of the United States. It is not necessary to lay the foundation for jurisdiction that the claims of Federal rights asserted should be well founded; it is enough if they are substantial claims of Federal rights within the statute, and such as were duly asserted and directly or necessarily denied in the judgment and decision of the state court.

Nor do we think there is anything in the stipulation entered into on the part of the Government by the United States district attorney, with a view to getting possession of the vessels, which were in the hands of the receiver, which in anywise deprived the Government of the right to assert any such immunity and privilege as it has because of the nature and character of the contracts and the lien of the Government in the premises.

An examination of these sections, 3753–3754, shows that they are intended to permit the United States to obtain possession of property claimed by it, when the same has been seized by judicial proceedings under the laws of the State, and to give to it and to the persons asserting rights in the property protection in their rights, notwithstanding such changes in possession.

In § 3753 it is expressly provided that "nothing herein contained shall, however, be considered as recognizing or conceding any right to enforce by seizure, arrest, attachment or any judicial process any claim against any property of the United States, or against any property held, owned or employed by the United States, or by any department thereof, for any public use, or as waiving any objection to any proceeding instituted to enforce any such claim."

Section 3754 provides for the protection of persons asserting claims against such property, and that after final judgment given in the court of last resort, to which the Secretary of the Treasury may deem proper to carry

the proceedings, affirming the rights of the persons asserting claims for the security or satisfaction of which such proceedings were instituted in the state courts against such property, notwithstanding the claims of the United States, the final judgment shall be deemed to all intents and purposes as a final determination of the rights of such persons, and shall entitle such persons as against the United States to such right as they would have in case the possession of such property had not been changed. The section provides for the payment of such final judgment out of the Treasury of the United States.

The evident purpose of these sections is that neither the United States nor the claimants to the property shall lose any rights because of the release of the property under the stipulation, but as were the rights of the parties before the change of possession such they shall continue to be. We do not agree that by entering into a stipulation, which embodied these terms, the United States lost any right which it had to assert claims under the contracts, or rights by reason of the sovereignty of the United States, if any such exist. We think this court has jurisdiction of this case upon this writ of error.

Taking up the consideration of the case as to these several vessels, and first as to the Benyuard, this dredge was constructed under the provisions of a contract which are thus summarized by the master in the Virginia Chancery Court:

"Materials furnished and the work done by the William R. Trigg Company were to be subject to rigid inspection by an inspector appointed on the part of the Government, his decision to be final as to quantity and quality.

"If the Trigg Company should fail to begin or prosecute the work in accordance with the specifications, which were made a part of the contract, the contract might be annulled by the Government. In that case all payments were to cease, and all money or reserved percentage must

be retained until the final completion and acceptance of the boat. The Government was to have the right to recover anything paid for such completion in excess of the original contract price with the William R. Trigg Company, including all extra cost of inspection; and might proceed under section 3709 of the Revised Statutes of the United States to provide for the completion of the boat by open purchase or contract, unless the time for such completion should be extended.

"It was expressly provided that the William R. Trigg Company should be responsible for and pay all liabilities incurred in the prosecution of the work for labor and materials.

"Section nine of the contract was as follows:

"'It is further agreed by and between the parties hereto that until final inspection and acceptance of, and payment for, all materials and work herein provided for, no prior inspection, payment, or act is to be construed as a waiver of the right of the party of the first part to reject any defective work or material or to require the fulfilment of any of the terms of the contract.'

"Section 199 of the specifications was as follows:

"'The purpose and spirit of these specifications are that the contractor is to provide and deliver a staunch dredge hull and first-class machinery, complete in every respect.'

"Section 206 of the specifications was as follows:

"'It is understood and agreed that the contractor assumes full responsibility for the safety of his employees, plant, and materials, and for any damage or injury done by or to them from any source or cause.'

"Section 209 provided for sea trials at the expense of the contractor, any defects that might appear to be remedied at his expense and trials to be repeated until the steamer should be found satisfactory in all respects. Section 210 provided that if the requirements of the specifications were complied with, ten (10) equal payments

OCTOBER TERM, 1910.

should be made, based on the reports of the inspector, the first when the hull and propelling machinery should be 10 per cent complete, the second when 20 per cent complete, and so on, to the last payment to be made, when the vessel should be turned over to the United States after successful trial; from each of said payments, except the last, 20 per cent to be reserved until final payment.

"Section 211 was as follows:

" 'The parts paid for under the system of partial payments above specified shall become thereby the sole property of the United States, but this provision shall not be interpreted as relieving the contractor from the sole responsibility for the proper care and protection of said parts prior to the delivery of the dredge to the United States, or from any other of the provisions of these specifications.'

"Section 212 provided for insurance against fire and marine risks at the contractor's cost, for and in behalf of the United States, to at least the amount of each partial payment.

"The evidence shows that the Government had paid $142,550.80 on account of this contract when the receiver was appointed in this cause, and that said dredge was then 70 per cent complete."

It is the contention of the Government that the terms of this contract are such that by its expressed provisions the vessel was to become the property of the United States as fast as it was paid for. A majority of the learned judges of the Supreme Court of Appeals of Virginia were of opinion that title did not pass to the Government under this contract, and that it was subject to the superior lien of claimants under the state laws of Virginia. It is undoubtedly true that the mere facts that the vessel is to be paid for in installments as the work progresses, and to be built under the superintendence of a government inspector, who had power to reject or approve the materials, will

not of themselves work the transfer of the title of a vessel to be constructed, in advance of its completion. But it is equally well settled that if the contract is such as to clearly express the intention of the parties that the builder shall sell and the purchaser shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual in law to pass the title. 2 Parsons on Contracts, 8th ed. 259, and cases cited.

All sections of the agreement must be read in the light of the purposes of the contracting parties as gathered from the entire contract, and must be considered in connection with other provisions of the contract. And it is said that § 212, as to insurance, does not show an intention to protect the title transferred to the Government, but must be read in the light of the purpose of the Government to acquire title to the dredge in the event that it ultimately elected to take it over as a purchaser, the ownership in the meantime remaining in the builder until such final decision was made, and the insurance was required for the Government's security for the partial payments.

But we cannot agree to this construction of § 212. The ownership clause provides that parts paid for *are to become the sole property of the United States* (specifications, § 211), insurance was to be provided by the contractor preceding each partial payment, that is, as fast as title vested in the Government by reason of the partial payments insurance was to be effected "to at least the amount of such partial payment, and the property was to be kept insured to at least the aggregate of the payments made until delivery and final acceptance."

It is insisted that the right to reject the dredge, or to annul the contract, is inconsistent with the passage of title under the provisions of § 211 of the specifications, however positive that section may be in terms.

Section 9 of the contract provides:

"It is further agreed by and between the parties hereto ·
that until final inspection and acceptance hereof, and
payment for, all the material and work herein provided
for, no prior inspection, payment, or act is to be construed
as a waiver of the right of the party of the first part to
reject any defective work or material, or to require the
fulfillment of any of the terms of this contract."

Let it be conceded that this section gave the Govern-
ment the right to reject defective work or material, or
even the entire dredge, if, upon trial and before final ac-
ceptance, it proved defective, is that right inconsistent
with the vesting of title in the parts as paid for, as specific-
ally provided in § 211? We think not. It may be that
in such contingency the Government might reject the
dredge. This might be true consistently with the acquire-
ment of title in parts accepted and paid for after inspec-
tion. That is, if the whole, upon final trial, proved de-
fective, all, including the restoration of that acquired,
might be within the power of the Government. See in ·
this connection, *The Poconoket,* 67 Fed. Rep. 262, 266.

The provisions of § 4 look rather to the completion,
of the vessel by the Government in the event of the annul-
ment of the contract for failure to keep its requirements. ·
In that contingency it is provided that payments shall
cease and reserved payments be retained until the final
completion and acceptance of the work. In this section
the United States is given a remedy for the cost of com-
pletion upon the failure of the contractor to prosecute
the work according to the contract.

Nor do we find it inconsistent with the vesting of the
title in parts that bond was taken in the sum of $60,000
for the performance of the contract. The United States
might well secure itself in this sum, notwithstanding it
took title to parts as paid for. Security might neverthe-
less be required for the faithful doing of the work within
the stipulated time. It is also true that the Trigg Com-

pany was to be responsible for and pay all liabilities for labor and material incurred in the prosecution of the work. We are at a loss to see any inconsistency between this provision and the passing of the title in parts as paid for. Construing the whole contract, we find nothing in its other provisions which cuts down or lessens the binding force of the clear and distinct provisions of § 211 as to ownership. The parties therein dealt with a specific part of the contract, they expressed themselves clearly upon the subject, and it is not to be presumed, in the absence of clear expression or necessary implication, that they intended to supersede this provision in dealing with other specific or general parts of the agreement.

It is suggested, in this connection, that the contract with the Government in the case of the Benyuard is not different in effect than the one passed upon in *Clarkson* v. *Stevens*, 106 U. S. 505. In that case the contract provided that the materials received at the yard for the construction of the steamer should be distinctly marked with the letters "U. S.," and should become the property of and belong to the United States. There' was no provision that title to the vessel should vest in the United States as fast as parts thereof were constructed, and Mr. Justice Matthews, who delivered the opinion of the court, approved the opinion of the Court of Errors and Appeals of New Jersey, expressing the view that the declaration as to the materials excluded the implication sought to be raised as to the title in the unfinished ship; "for," said Mr. Justice Matthews, "the inference is obvious, from the particularity of such a provision, that the larger interest would not be left to mere intendment." *Clarkson* v. *Stevens*, 106 U. S. 516.

In *Briggs* v. *A Light Boat*, 7 Allen, 287, a builder's lien, taken under the Massachusetts statute on a light-boat being built for the United States, was sustained. In that case the contract made no provision for a lien in favor

of the Government or the passing of the title to the boat in progress of construction. Mr. Chief Justice Bigelow, delivering the opinion of the Supreme Judicial Court of Massachusetts, used this significant language (page 297).

"If this were a suit brought by the builders to enforce a lien for materials furnished for the construction of a ship under a contract directly with the Government, or for repairs on a public vessel, the title of which was vested in the United States at the time the work was done or the supplies were furnished, the argument founded on public policy, and the suggestions arising from the inconvenience of causing delay and embarrassment to the public service, would be entitled to very great weight. It might in such case be open to grave doubt whether a lien on the property of the United States could be given by virtue of an enactment of the legislature of a State, or whether services rendered and materials supplied directly to the Government must not be presumed to have been furnished exclusively on the faith and credit of the United States, to the exclusion of any intent to rely on a lien upon the public property. But considerations of this nature have no application to a case like the present. It would have been competent for the United States, if they wished to avoid the inconvenience or danger of delay arising from liens in favor of private persons, to make their contract in such form as to divest the builder of any title to the property in the vessel during the process of construction, or to stipulate for the application of the purchase money to the extinguishment of all claims for materials furnished to the builder."

As we construe the contract for the construction of the Benyuard, it did "divest the builder of any title to the property in the vessel during the process of construction." The question in this aspect of the case then becomes one as to the right of a state lien law to fasten upon the prop-

erty of the United States, and that property a vessel intended for the use of the Government in carrying on its necessary operations. in the exercise of its governmental authority.

It was in recognition of the inability of contractors for labor and material to take liens upon the public property of the United States that Congress passed the act of August 13, 1894, c. 280 (28 Stat. 278), amended February 24, 1905, c. 778 (33 Stat. 811), providing for bonds in favor of those who furnished labor or materials in the construction of public works. It was in view of this purpose to provide protection for those who could not protect themselves by liens upon public property that the statute was given liberal construction in this court. See *Guaranty Trust Co.* v. *Pressed Brick Co.*, 191 U. S. 416, 425; *Hill* v. *Surety Co.*, 200 U. S. 197, 203.

As we read the decision of the Supreme Court of Appeals of Virginia, it is not held that a lien was fixed upon the dredge, if in fact the title thereto passed to the United States. In any event, it could not be tolerated that property of the United States could be seized or encumbered under state lien laws of the character in question. We are not now dealing with the right of a State to provide for such liens while property to the chattel in process of construction remains in the builder, who may be constructing the same with a view to transferring title therein to the United States upon its acceptance under a contract with the Government. We are now treating of property which the United States owns. Such property, for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty against the consent of the Government. The Benyuard, as fast as constructed, became one of the instrumentalities of the Government, intended for public use, and could not be seized under state laws to answer the claim of a private person, however meritorious.

Nor do we think the case one for the application of the doctrine governing cases where the United States claims an interest in property lawfully in possession of a court which is administering it—as in equity or in admiralty— and the Government intervenes to protect its interest therein. In such instances its rights must be adjudicated in recognition of the rights and demands of others interested in the same property. In this case the vessels were released under a stipulation which fully protected the rights of the United States, and the Government claims the exclusive right and title in the Benyuard as the parts were completed and paid for.

In the case of the Mohawk there is no such stipulation as to passing of the title on partial payments in the progress of the work as is found in the contract for the Benyuard. The Secretary of the Treasury was, in his discretion, to make partial payments under the contract during the progress of the work, not to exceed 75 per cent of the value of the labor and materials actually furnished and delivered, and a lien was reserved for such payments, in the following language:

"*Provided*, That a lien shall be, and hereby is, reserved to the United States upon the hull, machinery, fittings and equipment of said vessel, and the materials on hand for use in her construction, respectively and collectively, for all moneys advanced on account thereof, and that such lien shall commence with the first payment, and shall thereupon attach to the work and the materials furnished, and shall in like manner attach from time to time, as the work progresses, and as further payments are made, and shall continue until the completion and acceptance of said vessel."

This lien, it is asserted, was reserved in accordance with a joint resolution of Congress passed May 5, 1894, No. 24 (28 Stat. 582, 583), which is as follows:

"*Resolved by the Senate and House of Representatives*

*of the United States of America in Congress assembled,* That the Secretary of the Treasury be, and he hereby is, authorized to make partial payments, from time to time, upon existing contracts and all contracts hereafter made for the construction of vessels for the Treasury Department, but not in excess of 75 per cent of the amount of the value of the work already done; and that the contracts hereafter made shall provide for a lien upon such vessels for all advances so made: *Provided,* That nothing in this joint resolution shall be construed to hereafter authorize any partial payments except on contracts stipulating for the same, and then only in accordance with such contract stipulation."

On behalf of the Government it is contended that this resolution makes the lien of the Government, reserved under the contract, an express statutory lien by authority of the United States, and consequently superior to any asserted rights under the lien laws of a State. But we cannot agree to this contention. The joint resolution, if it be conceded to have the effect of an act of Congress, does not undertake to create a statutory lien, but directs how contracts thereafter made shall provide with reference to liens upon such vessels. As to future contracts, it is directed that they shall provide for liens upon vessels for advances thus made. We think the lien mentioned is only one created by the terms of the contract and is to be considered in the light of the other provisions thereof.

At the time of entering into the contract, a bond was required and was given by the Trigg Company in the penal sum of $45,000, conditioned for the proper construction of the vessel according to the contract and specifications, and that the Trigg Company should promptly make payments to other persons supplying labor and materials in the prosecution of the work. We think this requirement was a distinct recognition on the part of the Government that the Trigg Company might become in-

debted to other persons who should perform labor or furnish materials in the building of the vessel, who might become entitled, by reason of such claims against the company, to liens upon the property.

The contract was made with the Virginia corporation, and it was intended that the bond required of the Trigg Company should protect the Government against rights arising out of labor performed or material furnished in the construction of the vessel. Conceding it to be true for this purpose, as asserted by the counsel for the Government, that the United States can make contracts providing liens of this character which shall be superior to the claims of any persons for liens under state laws, it is none the less certain that it may if it chooses recognize the authority of the States to protect persons who may furnish labor or materials for the construction of government work. Indeed, such, as we have seen, is the policy of the Government in respect to public buildings and structures, upon which liens cannot be taken under the laws of the States. In order that such claims may be satisfied the United States has made provision for their protection by bonds upon which persons may recover damages, so that those who furnish property of which the Government receives the benefit shall not entail a loss by so doing. Read in the light of this policy, so manifestly just and proper, and the requirements of this contract and bond, we think that the Government did not intend that the lien, which it reserved for itself, should be superior to that of contractors for labor and material who had contributed to the work.

The case of the Galveston is controlled by the same principles. In that contract there was no provision for taking title to the vessel; on the contrary, it was stipulated that on certain conditions the title should vest in the United States as collateral security, and the eighteenth clause of the contract provides for the release of liens

before partial payments shall be required. This clause is distinct and clear in its requirements, and reads:

"When a payment is to be made under this contract, as a condition precedent thereto, the Secretary of the Navy may, in his discretion, require, for the protection of the party of the second part, evidence satisfactory to him, to be furnished by the party of the first part, that no liens or rights *in rem* of any kind against said vessel, or her machinery, fittings, or equipment, or the material on hand for use in the construction thereof, have been or can be acquired for or on account of any work done or any machinery, fitting, equipment, or material already incorporated as a part of said vessel, or on hand for that purpose, or that such liens or rights have either been released absolutely, or so subordinated to the rights of the Government as to make its lien for all payments paramount, so as not to encumber or hinder in any way the right of the Government to accept or reject said vessel, and so as to become absolutely extinguished in case of the acceptance of the vessel."

The effect which we give this provision is strengthened by the opinion rendered to the Secretary of the Navy by the Attorney General, that in his opinion the practice of the Navy Department in making such contracts recognized that liens of this class might be acquired on vessels where there was no provision in the contract for vesting title in the same in the United States. 23 Op. Atty. Gen. 174, 176.

We think that this contract, as the one for the Mohawk, was made in recognition of the rights of those who should furnish work or material for the vessel to secure their claims by liens which it was made the duty of the contractor to provide for in order to protect the title of the United States.

Upon the whole case we reach the conclusion that judgment must be affirmed as to the Mohawk and Galveston,

and reversed as to the Benyuard, and it is so ordered. The case is remanded to the Supreme Court of Appeals of Virginia for further proceedings not inconsistent with this opinion.