In re READ–YORK, Inc.

UNITED STATES v. DAVIES.

Nos. 8768, 8769.

Circuit Court of Appeals, Seventh Circuit.

Dec. 20, 1945.

John F. Sonnett, Samuel D. Slade and Bonnell Phillips, all of Washington, D. C., and Timothy T. Cronin and E. J. Koelzer, U. S. Atty., both of Milwaukee, Wis., Rawlings Ragland, Acting Head, Claims Division, of Washington, D. C., and David L. Kreeger, Sp. Asst. to Atty. Gen., for appellant.

David L. Phillips and Walter W. Hammond, both of Kenosha, Wis., for appellee.

W. H. Putnam, Atty., Enforcements Division, State of Wisconsin, Industrial Commission, of Madison, Wis., for amicus curiae.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is a summary proceeding in bankruptcy instituted by the petition of Alfred R. Davies, trustee in bankruptcy of Read-York, Inc., asking the bankruptcy court to confirm title of certain property in the trustee and to issue an injunction against the disposition of said property by the United States.

The District Court entered its order confirming the trustee's title to the property in question, and enjoining any interference with, removal or transferral of, said property. From this judgment, the United States appeals.

On May 26, 1943, the United States, by the War Department, entered into contract No. W-535-ac-40197 with Read-York, Inc., whereby Read-York agreed for the total consideration of $426,230 to manufacture and deliver to the Army Air Forces, three experimental gliders, two to be completed for flight test purposes. On August 6, 1943, the parties entered into a Supplemental Agreement No. 1 to the contract, whereby a further provision, designated as Article 44, was added to the contract. This provided as follows:

"(a) The Contracting Office may, from time to time authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: Provided, That such partial payments shall not exceed 75% of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer: Provided, further, That in no event shall the total of the unliquidated partial payments (see (c) below) and of unliquidated advance payments, if any, made under this contract exceed 80% of the total contract price of supplies still to be delivered.

"(b) The title to all property upon which any partial payment is made prior to the completion of this contract shall vest in the Government in its then condition forthwith upon the making of any such partial payment or payments: Provided, That nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; nor relieve the Contractor or the Government of any of their respective rights or obligations under this contract.

"(c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the contractor under the authority contained."

On September 22, 1943, the parties executed Supplemental Agreement No. 2 to the contract, which in effect specified the figure 90% in place of the 75% and 80% limitations expressed in Article 44(a) of the contract as previously supplemented.

For the purpose of conducting its operations under the contract, Read-York leased certain premises in Kenosha, Wisconsin, from the Simmons Manufacturing Company. About October 16, 1943, Read-York ceased work on its contract and vacated the leased premises. Certain property, including the property in dispute here, was left in the Kenosha plant. The Government, prior to the abandonment of the project by Read-York, had made progress payments upon its property in the amount of $333,359.40, under the provisions of Article 44 of the contract. October 16, 1943, the Army Air Forces took possession of such property at the Kenosha plant, where it remained in storage and subject to the control of the Government. Neither Read-York nor anyone in its behalf resumed or performed any further work under the

contract. December 6, 1943, the Contractor was served with notice of termination for default, based upon this abandonment of the project and the failure of the only glider theretofore completed by Read-York to meet the required structural specifications.

On June 29, 1944, Read-York was adjudged an involuntary bankrupt. At the first meeting of creditors the appellee, Alfred R. Davies, was elected trustee. The bankrupt schedule admitted liabilities in excess of $700,000 with assets consisting entirely of personal property of a market value probably not in excess of $5,000. October 2, 1944, the trustee filed a petition and affidavit stating, upon information and belief, that the United States or agencies thereof "assert some claim arising out of an unrecorded contract" to the materials and supplies stored in the Kenosha plant; that the bulk of said material and supplies had been listed as assets of the bankrupt, Read-York, on the schedule heretofore filed by the bankrupt; and that no claim thereto had been filed either with him or with the referee on behalf of the United States. The petition prayed that the court, inter alia, (1) confirm title in the trustee to the property in the Kenosha plant listed on the bankrupt schedules, and (2) issue an order to show cause why the Government or any interested agency thereof should not be restrained from selling, moving, or otherwise interfering with the trustee's "custody and possession" of the property.

On October 5, 1944, the court issued the requested show cause order and a temporary injunction. Thereafter, on October 16, 1944, a motion and affidavit were filed on behalf of the United States requesting denial of the trustee's petition and the dissolution of the temporary injunction. No affirmative relief in the form of a cross-petition to affirm the United States' title to the property was requested.

On November 20, 1944, the court rendered its opinion. The opinion noted that the United States had, in the oral argument, contended that the title to the property cannot be determined in a summary proceeding. It held, however, that the Government's motion to deny the trustee's petition and to dissolve the temporary injunction, constituted a general appearance importing a waiver to any right to a plenary trial on the issue of title. On the merits, the court further held that the trustee's title should prevail because the Gov-

ernment's contract with Read-York had not been recorded as allegedly required by certain Wisconsin statutes.

On December 19, 1944, the United States filed a motion to vacate the court's order, reiterating certain of its objections to the court's jurisdiction. December 23, 1944, the United States, prior to a decision on its motion to vacate, filed a notice of appeal from the order of the court below. January 2, 1945, the trustee filed an affidavit in opposition to the motion to vacate. On the same date, the court entered an order denying the motion to vacate on the ground that the appeal noted on December 23, 1944, had deprived it of further jurisdiction in the matter. An appeal was likewise taken from this order.

■■ At the outset the point is made that the judgment is void for want of jurisdiction because (1) the proceedings were in effect a suit against the United States which Congress had not authorized to be brought, and (2) none of the elements permitting summary adjudication by a bankruptcy court of rights and claims to property was present.

Title 28 U.S.C.A. § 41(20) gives district courts jurisdiction, and consent is given to sue the United States on claims not exceeding $10,000 arising out of a contract, and § 41(19) of the same Act establishes the jurisdiction of the district courts over bankruptcy matters, Harris v. Avery Brundage Co., 305 U.S. 160, 59 S.Ct. 131, 83 L.Ed. 100, and In re Murray, 7 Cir., 92 F.2d 612, and while it is true that if the Government's adverse claim is substantial and it does not consent to the court's jurisdiction, the court lacks summary jurisdiction, McDonald v. Plymouth County Trust Co., 286 U.S. 263, 52 S.Ct. 505, 76 L.Ed. 1093, yet formal objection to the exercise of summary jurisdiction must be made before that court makes a final order, Louisville Trust Co. v. Comingor, 184 U.S. 18, 22 S.Ct. 293, 46 L.Ed. 413, and In re Murray, supra, 92 F.2d 614. Since the parties had only a procedural right to have the issues tried in a plenary suit, they were at liberty to waive this right. Harris v. Avery Brundage Co., supra, 305 U.S. 164, 59 S.Ct. 131, 83 L.Ed. 100, and Cline v. Kaplan, 323 U.S. 97, 100, 65 S.Ct. 155.

■ In our case the record reveals that there was no special appearance filed by the Government. The Government appeared in the proceedings. It raised no objection

to the court's jurisdiction nor to the use of summary procedure, but moved the court to deny the petition of the trustee for confirmation of the title to the property in the trustee on the grounds set forth in the affidavit filed on October 16, 1944, thus seeking a determination of title by the bankruptcy court. In such a situation we are of the opinion that the Government waived the right to litigate its claim against the property in a plenary proceeding, and it must be held to have consented to jurisdiction.

We now consider the Government's claim that the court erred in holding its title to the property was invalid as against the trustee.

■ In interpreting the provisions of a written contract, the courts will look first to the express wording of the contract. If such wording be clear and unambiguous, no further search beyond the terms of the contract will be made to ascertain the intention of the parties. Article 44(b) of the contract provides:

"The title to all property upon which any partial payment is made prior to the completion of this contract shall vest in the Government in its then condition forthwith upon the making of any such partial payment * * *"

■ It would be difficult to state in more precise terms the conditions upon which title to the property vests in the Government. We find nothing in any other section of the contract inconsistent with Article 44(b).

Furthermore, the provision in this contract is strikingly similar to that found in the contract in the case of United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 31 S.Ct. 49, 52, 54 L.Ed. 1107. There the Government contracted for the building of a dredge, and the contract provided that partial payments should be made on the vessel as its construction progressed, and stated further,

"The parts paid for under the system of partial payments above specified shall become thereby the sole property of the United States * * *."

The court, 218 U.S. at page 467, 31 S.Ct. at page 52, 54 L.Ed. 1107, said of this provision:

"* * * it is * * * well settled that if the contract is such as to clearly express the intention of the parties that the builder shall sell and the purchaser shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual in law to pass the title.

"* * * * The ownership clause provides that parts paid for *are to become the sole property of the United States* * * . *."

It is clear from the Ansonia case that the United States had the power to contract for the passage of title to it of all property acquired by Read-York upon the basis of which partial payments were made. On page 471 of the Ansonia case in 218 U. S., on page 54 of 31 S.Ct., 54 L.Ed. 1107, the court, after having held that title to the property was in the United States, also said,

"* * * * We are now treating of property which the United States owns. Such property, for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty, against the consent of the government. The Benyuard, as fast as constructed, became one of the instrumentalities of the government, intended for public use, and could not be seized under state laws to answer the claim of a private person, however meritorious."

Having decided that title to some of the property in dispute was in the United States by virtue of Article 44(b) of the contract, we are next faced with the proposition that the contract between the United States and Read-York was not recorded, as allegedly required by Wisconsin law.

The trial court in its opinion referred to the long-established policy of the state of Wisconsin requiring certain contracts to be recorded. This policy is shown by the chattel mortgage statute holding such mortgages to be absolutely void unless filed as required by the statute (Wis.St.1943 § 241.08), the statute requiring the filing of conditional sales contracts (Wis.St. § 122.-05), the requirement that consignment contracts must be filed or the title shall be deemed in the consignee as to purchasers and creditors (Wis.St. § 241.26), and the section making certain transfers invalid where there is no genuine change of possession (Wis.St. § 241.05).

At first glance, there would seem to be no reason why an exception should be made to the general rule that a bona fide purchaser of unrecorded property (which is required to be recorded by state statutes) receives a clear title, when the un-

recorded property sold belongs to the United States. We are told that compliance with state recording statutes by the federal Government would retard, impede and burden the sovereign right of the Government. Whatever may be the merits of this argument, we do not face the question as an original proposition. That the cases have made a distinction between the necessity of complying with state recording statutes between private individuals or corporations and the United States was recognized, at least by implication, in the district court's opinion [60 F.Supp. 951, 952] as follows:

"Certainly *no creditor other than the federal government*[1] could come into a bankruptcy court in this State and obtain for itself title to personal property by virtue of a contract not filed as required by Wisconsin law. In re Urban, 7 Cir., 136 F.2d 296. * * *"

The Supreme Court has recently dealt with this question in United States et al. v. County of Allegheny, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209. Although this case involved state taxation, the court dealt directly with our problem. The opinion, 322 U.S. at page 183, 64 S.Ct. at page 913, 88 L.Ed. 1209, reads thus:

" * * * The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state. * * * *Federal statutes may declare liens in favor of the Government and establish their priority over subsequent purchasers or lienors irrespective of state recording acts.*[1] * * * Or the Government may avail itself, as any other lienor, of state recording facilities, in which case, while it has never been denied that it must pay nondiscriminatory fees for their use, the recording may not be made the occasion for taxing the Government's property."

The contract under consideration in the Allegheny case specifically required the parties to abide and be governed by the applicable state law. But the Supreme Court, in discussing this provision of the contract, 322 U.S. at page 189, 64 S.Ct. at page 916, 88 L.Ed. 1209, states:

" * * * It is true that the contract requires Mesta to obey and abide by the 'applicable' law of Pennsylvania. But such language does not require Mesta to submit to unconstitutional exactions. It clearly is inadequate to waive federal immunity, even if we assume a contracting officer had power to do so. * * *"

In an earlier case, the Supreme Court of Virginia, following the United States Supreme Court opinions, had stated this to be the rule of law. In United States v. William R. Trigg Co., 115 Va. 272, 78 S.E. 542, 544, the court asked this question:

" * * * In other words, are the United States bound to comply with the state registry laws and have their contracts recorded, in order to make effective and available the liens reserved in such contracts, as against those who have no liens?"

And the court gave this direct answer:

"In the light of the decisions of the Supreme Court of the United States, it is clear that this question must be answered in the negative.

"In United States v. Maurice, Fed.Cas. No. 15,747, 2 Brock. 96, Chief Justice Marshall decided, as the Supreme Court of the United States in subsequent cases has repeatedly held, that the power of the federal government to contract is one of the means necessary to accomplish the objects for which the government was established, * * *. A different principle would involve a denial of the ordinary rights of sovereignty. * * *

"*This power to contract,*[1] which is an incident of the sovereignty of the United States, and is, as stated by Judge Marshall, coextensive with the duties and powers of government, *carries with it complete exemption of the government from all obligation to comply with state registry laws, for the reason that it would grievously retard, impede, and burden the sovereign right of the government to subject it to the operation of such laws.*[1] * * *

"If the states had the power to interfere with the operations of the federal government by compelling compliance on its part with state laws, such as the registry statutes, then, in the language of the Supreme Court, the potential existence of the government would be at the mercy of state legislation."

■ The trustee contends that our case presents a situation controlled by Secs. 67,

---
[1] Emphasis added.

sub. a and 70, sub. e of the Bankruptcy Act of 1898, as amended, 11 U.S.C.A. §§ 107, sub. a and 110, sub. e. Under that Act, the federal law adopts state statutes and decisions as controlling in determining creditor's rights. But the language of the Allegheny case is so broad as to not admit the contention of the trustee that cases arising under the Bankruptcy Act require the federal government to comply with local recording statutes. The decision in the Allegheny case controls us here. The judgment of the District Court is reversed, and the cause is remanded with instruction to proceed in accordance with the views herein, expressed. It is so ordered.