SWYGERT, Senior Circuit Judge,
dissenting.
Because this case concerns the rights of the United States arising under a nation *1199 wide federal program, there is no question that federal law governs. United States v. Kimbell Foods, Inc., 440 U.S. 715, 726-27, 99 S.Ct. 1448, 1457-58, 59 L.Ed.2d 711 (1979). Yet, in defining the rule of decision that gives content to that federal common law, this court must often resort to State law, particularly where there is no express congressional directive to the contrary and where any other rule would disrupt commercial relations predicated on State law. See id. at 728-29, 740, 99 S.Ct. at 1458-59, 1464. I would apply Illinois’ Uniform Commercial Code as the rule of decision and would hold that the United States owned only an unperfected security interest in the seized assets.
In Kimbell, 440 U.S. at 728-29, 740, 99 S.Ct. at 1458-59, 1464, the Supreme Court held that State law should apply as the rule of decision in a commercial dispute involving a nationwide federal program if (1) there is no congressional directive to the contrary, (2) the federal program in question need not be uniform in character nationwide, (3) the application of State law would not frustrate specific objectives of the program, and (4) the application of a federal rule would disrupt commercial relationships predicated on State law. The majority holds, under two alternative theories, that the first criterion was not satisfied in the case at bar.
First, the majority holds that by passing legislation in 1958 expressly authorizing “progress payments,” see 10 U.S.C. § 2307(a)(1) (1982), Congress necessarily incorporated as binding federal law the past practices that defined the term. Because the United States had always purported to take absolute title — rather than a security interest — in the parts, work in process, and inventories of government contractors in return for progress payments, Congress must have intended to incorporate this practice into the law. See ante at 1193— 96.
Yet, as the majority’s thorough historical review demonstrates, ante at 1193-1194, the 1958 statute simply marked the culmination of Congress’ long retreat from its former prohibition of advances of public money to government contractors in excess of the value of services already rendered or goods already delivered. It was Congress’ intent to legalize the practice of advance payments in general. The statute and legislative history are silent on the question of whether the title-vesting clause that traditionally accompanied progress payments should be interpreted literally or as a de facto security interest. The only relevant concern of Congress was that the federal government be permitted to pay money in advance of contract performance; the specifics of defining the effect and ramifications of various contractual alternatives, such as progress payments, were left open.[1]
Congressional silence on such issues should not be interpreted as an invitation to the courts to fashion a uniform federal common law. The “guiding principle” in deciding whether to fashion rules of federal common law or to incorporate State law is that a “significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.” Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966). It is not enough that Congress could have readily enacted a complete code of law governing these commercial transactions better than the available State law; the “latent federal power ... to displace state law is primarily a decision for Congress,” and Congress must explicitly indicate its intent to exercise this power. See id.
The second theory advanced by the majority, see ante at 1196, is that assuming the Government’s interest should be defined as a security interest, pursuant *1200 to well-established principles of State commercial law, Congress has already provided by statute the governing law of priority. In authorizing liens to secure “advance” payments, Congress required that such liens be “paramount to any other lien.” 10 U.S.C. § 2307(c) (1982). Despite the historical differences between “advance” and “progress” payments, Congress must have used the term “advance payments” in the generic sense to include all kinds of payments in advance of full contract performance. “[W]e can think of no reason why Congress could have intended less protection for the Government when making progress payments than when making advance payments.” Ante at 1194.
I agree. Because Congress has expressly provided that government liens be paramount, this directive must be incorporated as a rule of priority. But one rule of priority does not make a commercial code. Congress provided no direction on a myriad of issues that must be decided in this case and in other commercial cases. There are no guidelines as to how to judge the validity of a government lien, when it attaches, or what prerequisites — such as perfection — must be met before a particular government lien can be enforced as a paramount lien. I would hold that State law provides the rule of decision in determining the creation, validity, and perfection of government liens.
It is not incongruous to hold that different sources of law govern various, but related, aspects of a single commercial transaction. Kimbell does not require that a commercial transaction be governed entirely by federal common law or entirely by State law. Indeed, the Supreme Court has stressed that “[e]ven where there is related federal legislation in an area ... it must be remembered that ‘Congress acts ... against the background of the total corpus juris of the states.’ ” Wallis, 384 U.S. at 68, 86 S.Ct. at 1304 (quoting Hart & Weeh-sler, The Federal Courts and the Federal System 435 (1953)). In Wallis the Court adopted the kind of hybrid law I propose in the case at bar. The Court held that while federal law governs the ability of private parties to assign oil and gas leases, State law governs the validity of a particular transfer between two parties. Similarly, this court in United States v. Meadors, 753 F.2d 590, 592 (7th Cir.1985), selectively applied State law to only a few of the specific issues of commercial law presented in that case. Such hybrid law is consistent with our conception of federal regulation as often “interstitial in nature, enacted against a background of state law and building on state law relationships.” Comment, Adopting State Law as the Federal Rule of Decision: A Proposed Test, 43 U.Chi.L. Rev., 823, 829 (1976); accord Mishkin, The Variousness of “Federal Law”: Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Penn.L.Rev. 797, 804-05 (1957) (“Most pervasive, perhaps, is the principle that a decision to apply state law as a matter of federal judicial incorporation may frequently be made as to a single issue at a time.”).
The first prong of Kimbell is therefore satisfied: there has been no congressional directive regarding what law should govern the creation, validity, and perfection of a government lien. Turning to the second prong, I would follow the Tenth Circuit’s holding that the government’s interest in a uniform federal law for military procurement would not be compromised by the incorporation of the Uniform Commercial Code (“UCC”) as the rule of decision. In re Murdock Machine & Engineering Co. of Utah, 620 F.2d 767, 772-73 (10th Cir.1980). The need for uniformity is already satisfied by State law itself, inasmuch as every State except Louisiana has enacted the UCC. See J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 1 at 1 & n. 1 (2d ed. 1980). Here, as in Kimbell, 440 U.S. at 732-33 & n. 28, 99 S.Ct. at 1460-61 & n. 28, there is no evidence that the “minor variations” in Article 9 of the UCC from State to State would hinder the government’s national program. That the government program here involves national defense does not alter this conclusion. I fail to see how *1201 the trivial inconveniences attending compliance with the essentially uniform recording requirements of the States somehow threaten national security. Accord Murdock, 620 F.2d at 772-73.
As for the third prong of Kimbell, it can be argued that destroying the priority of federal liens by subjecting the federal government to State recording requirements would frustrate a specific objective of the federal procurement effort: to ensure that federal liens are paramount to all others. It is true that incorporating State law as the rule of decision in the case at bar may effectively destroy the value of the Government’s claim to the seized assets. Yet, if noncompliance with State recording laws would effectively defeat the Federal government’s ability to claim a paramount lien, certainly compliance would not.[2] The Government’s assertion at oral argument that incorporating the UCC into federal law would destroy the value of billions of dollars of government liens is an argument against retroactive application of such a rule, not an argument that the government would be unable to protect its interests under the UCC in the future.
There is no question that the fourth prong of Kimbell is satisfied. The application of a federal rule would disrupt commercial relationships predicated on State law. With an annual budget that will soon exceed $300 billion, see Boyd, Leaders Report Budget Accord with President, N.Y. Times, July 10, 1985, at 11, col. 5, the Defense Department has an enormous, brooding presence in the marketplace. Yet, it is not always obvious that the military is involved in a particular transaction. There is nothing inherent in the purchase of such pedestrian goods as food in the case at bar or steel in Murdock that alerts the seller to the military’s presence. Thus, allowing the military to hold enormous secret liens wreaks havoc with the expectations of the business community. “Mindful of the burdens of time and expense such investigations [of the possibility of the military’s interest in a transaction] would impose on our nation’s commerce, and the injustice which would result by dealing government ‘wild cards’ to businessmen at random,” I am “not inclined to create a special commercial law for the government’s benefit.” Murdock, 620 F.2d at 772.
I would therefore hold that State law provides the rule of decision governing the creation and perfection of the Government’s security interest. As the majority apparently agrees, see ante at 1193, there can be little doubt that the title-vesting clause created a security interest. Illinois’ UCC defines a secured transaction to include “any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures.” Ill.Ann.Stat. ch. 26, § 9-102(l)(a) (Smith-Hurd 1974) (“Ill. UCC”). Thus, the Government’s characterization of its interest as one of absolute title is irrelevant; it is the intent of the parties, not the form of the transaction, that is dispositive.[3] Here, the many incidents of ownership conferred on Pouch[4] combined with the federal contract officer’s testimony that the purpose *1202 of the title-vesting clause was to secure performance, see Appellant’s Brief at 26-27 (quoting Transcript), compel the conclusion that the parties intend the Government to take only a security interest.
It is undisputed that the Government failed to file a financing statement pursuant to Ill. UCC §§ 9-103, 9-302, 9-401-03. The Government therefore held only an unperfected security interest in the seized assets. Id. at § 9-303. To be sure, this did not render the security agreement invalid or unenforceable. And it can be argued that as long as the Government’s security interest is valid under State law, the federal rule of priority should apply to render the Government’s lien paramount. Yet, the federal statute is so sparse as to what prerequisites should be met to create a valid and enforceable paramount lien that I would define the State perfection requirement as such a prerequisite. Only in this way can federal legislation that is interstitial in nature be brought into harmony with the broad body of State law that remains in force and effect until expressly replaced with more comprehensive federal legislation. See supra at 1200.
I would hold then, that before the Government seized Pouch’s assets, it held an unperfected security interest. As such, its rights were subordinate to those of a variety of other creditors, including the debtor-in-possession. See Ill. UCC §§ 9-301(1), (3).[5]
It should be noted, however, that once the Government came into possession of the collateral, no creditor, regardless of its superior claim of right, could compel repossession. Such repossession would be inconsistent with the sovereignty of thé United States. Rather, the remedy for those who held superior claims to the collateral is to sue for their proper share of the proceeds, because in destroying the value of their claims, the Government took their property without just compensation. See U.S. Const, amend. V; Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 471, 31 S.Ct. 49, 54, 54 L.Ed. 1107 (1910); Marine Midland Bank v. United States, 687 F.2d 395, 397-98, 231 Ct.Cl. 496 (1982), cert. denied, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983).
I would therefore reverse and remand for further proceedings.

. Thus, in explaining its legalization of advance payments, the Senate Report simply cited the need for a "modernized code of procurement procedures." S.Rep. No. 2201, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Ad. News 4021, 4024. Congress approved the principle of advance payments as consistent with modern commercial practice, but left to others the task of defining the specific rules governing advance payments.

. I would therefore hold that if the government executes a proper security agreement and if its lien attaches and is perfected, then the government holds a paramount lien. — superior in priority even to the perfected security interests of other creditors.

. To be sure, the Supreme Court in United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 466-67, 31 S.Ct. 49, 52-53, 54 L.Ed. 1107 (1910), interpreted the title-vesting clause literally. Yet, this holding simply provided a rule of federal common law. Because Kimbell, properly applied, requires the court to rely on State law in the case at bar, the Ansonia Brass rule is irrelevant.

.For example, the contract provided that Pouch (1) retain possession of the contract property with full authority to process it, (2) bear the risk of loss, (3) sell any production scrap, and (4) gain title to property obtained from suppliers as soon as all progress payments were repaid or as soon as the contract deliveries were made. Curiously enough, the contract also required Pouch to convey title to the Government if the contract was terminated "for cause" or “for convenience.” See Appellant’s Supplemental Appendix at 63a (reprinting contract).

. On the other hand, the creditors that the debt- or-in-possession represents in addition to the Government may not enjoy a superior claim to the seized assets. Even an unperfected security interest has priority over the interest of an unsecured creditor, although there are some exceptions. See Ill. UCC § 9-301. As for secured creditors, the Government points out that Pouch’s two major lenders had executed agreements subordinating their claims to those of the Government. Appellee’s Brief at 5. Thus, it is quite likely that even under my proposed disposition of the case, the Government would ultimately prevail, though certainly a remand would be necessary to determine whether this is correct.