**UNITED STATES of America**

v.

**PEARSON'S E.F. & C., INC. and Alice National Bank.**

**Civ. A. No. C–87–119.**

United States District Court, S.D. Texas, Corpus Christi Division.

Sept. 19, 1990.

Wayne Campbell, Asst. U.S. Atty., Corpus Christi, Tex., for plaintiff.

W. Bradford Hill Jr., Meridith, Donnell & Abernathy, Corpus Christi, Tex., for defendant Pearson's E.F. & C., Inc.

William R. Kendall Jr., Kleberg & Head, Corpus Christi, Tex., for defendant Alice Nat. Bank.

OPINION

PATRICK E. CARR, District Judge.[*]

This matter came before the Court for trial without a jury on April 10–11, 1990. The Court now rules as follows. To the extent the following findings of fact constitute conclusions of law, the Court adopts them as such; to the extent the following conclusions of law constitute findings as fact, the Court adopts them as such.

Another casualty from the bankruptcy of the defense contractor Wedtech Corporation, this case concerns a dispute between the Navy and a Wedtech subcontractor over forty pontoons that the subcontractor built for Wedtech and for which the subcontractor has never been fully paid. The Court holds that the government has no title to or possessory interest in the pontoons.

I.

The plaintiff in this action is the United States of America. The defendants in this action are Pearson's E.F. & C., Inc., formerly known as Pearson's Welding & Construction Company, a Texas corporation with its principal place of business in Corpus Christi (Nueces County), Texas; and Alice National Bank, a federally chartered bank located in Alice (Jim Wells County), Texas.

A. *The Navy's prime contract
with Wedtech*

On April 17, 1984, the U.S. Navy entered into a defense contract with Wedtech Corporation for the purchase of a specially-designed causeway system, Contract No. N62472–84–C–3116.[1] By May 1986, the contract was modified over ninety times.

As evidence of the contract, the government has submitted a 91–page exhibit.

While there is no contention or evidence that the exhibit submitted is not an authentic copy of *portions* of the contract, a simple scan through these 91 pages shows that other large portions of contract as modified are lacking from the record. The 91 pages break into seven parts:

Pp. 1–31 The original contract (dated 4/17/84)[2]

Pp. 32–43 Modification No. P00020 (dated 3/15/85)

Pp. 44–60 Modification No. P00064 (dated 11/14/85)

Pp. 61–73 Modification No. P00094 (dated 5/21/86)

Pp. 74–79 A verbatim copy of Defense Acquisition Regulation 7–104.35(b) (rev. Sept.1982), entitled "Progress Payment for Small Business Concerns"

Pp. 80–81 A verbatim copy of Defense Acquisition Regulation 7–103.11 (rev. Aug.1969), entitled "Default."

Pp. 81–91 Duplicate copy of pages 63–72.

Neither side has provided any evidence of what was contained in any other modifications to the original contract.

The original contract contains no specific provisions on, or references to Federal or Defense Acquisition Regulations on, title or possession of items covered in the contract. Further, the original contract contains no provisions that "P–9 pontoons" were among the covered items.

Modification No. P00020 provides for, among other items, the sale of eighty P–9 pontoons in accordance with certain Naval Facilities Engineering Command Contract Drawings. Under the entry for these eighty items appears the following notation:

PQA: Origin ACCEPT: Origin FOB: Origin

---

[*] Patrick E. Carr, United States District Judge for the Eastern District of Louisiana, sitting by designation.

[1] Actually, the Navy's Naval Facilities Engineering Command entered into a prime contract (No. N62472–84–C–3116) with another federal agency, the U.S. Small Business Administration (SBA), which in turn entered into a "first tier" subcontract (No. 28410183) with Wedtech. For purposes of this opinion, however, the Court refers to Wedtech as the prime contractor.

[2] Actually, pages 2 and 17–31 apply specifically to the first tier subcontract between the SBA and Wedtech, while pages 1 and 3–16 apply specifically to the prime contract between the Navy and the SBA; pages 17–29 and 31 correspond almost identically to pages 1, 3–6, and 8–16 (the exhibit has no second page corresponding to page 7).

Pearson Welding & Construction Co., ..., Corpus Christi, Texas

DELIVERY: On or before 15 February 1986

Gov't Exh. 1, at 40. Like the original contract, this modification contains no specific provisions on, or references to Federal or Defense Acquisition Regulations on, title or possession of items covered in the contract.

Modification No. P00064 does not concern any P-9 pontoons, but contains the following pertinent entry for the items it does concern:

(3) ... Clause I.39 entitled "Progress Payments—Alternate I (Deviation) (Small Business) (Authorized Deviation DAR Case 85-74) (APR 1984) (FAR 52.-232-16)" [is] attached hereto and appl[ies] to this Modification.

Id. at 46. Attached to the modification is a verbatim copy of Federal Acquisition Regulation 52.232-16, which provides in pertinent part:

(d) *Title.*

(1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

(2) "Property," as used in this clause, includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices.

(i) Parts, materials, inventories, and work in process; ...

. . . .

(j) *Progress payments to subcontractors.* The amounts mentioned in (a)(1)(ii) above [on "progress payments to subcontractors"] shall be all progress payments to subcontractors or divisions, if the following conditions are met:

. . . .

(3) The terms of the subcontract or interdivisional order concerning progress payments—

(i) Are substantially similar to the terms of the clause at 52.232-16, Progress Payments, of the Federal Acquisition Regulations (or that clause with its Alternate I for any subcontractor that is a small business concern); [and]

(ii) Are at least as favorable to the Government as the terms of this clause;

. . . .

Id. at 59-60.

Modification No. P00094 provides for the sale of, among other things, 64 more P-9 pontoons. Unlike Modification No. P00020, however, this modification contains no reference to Pearson's. The modification contains a provision similar to the above one in Modification No. P00064:

(2) ... Clause I.39 entitled "Progress Payments—Alternate I (Deviation) (Small Business) (Authorized Deviation DAR Case 85-74) (APR 1984) (FAR 52.-232-16)" appl[ies] to this modification.

Id. at 69; *accord id.* at 88.

Between the duplicate copies of this modification, Government Exhibit 1 contains verbatim copies of Defense Acquisition Regulation 7-104.35(b) (rev. Sept. 1982), entitled "Progress Payment for Small Business Concerns," and Defense Acquisition Regulation 7-103.11 (rev. Aug. 1969), entitled "Default." The progress payment provisions include the following:

Progress payments shall be made to the Contractor when requested as work progresses, but not more frequently than monthly, in amounts approved by the Contracting Officer under the following terms and conditions:

. . . .

(d) Title. Immediately, upon the date of this contract, title to all parts; materials; inventories; [and] work in process ... theretofore acquired or produced by

the Contractor and allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government and title to all like property thereafter acquired or produced by the Contractor and allocable or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. Notwithstanding that title to property is in the Government through the operation of this clause, the handling and disposition of such property shall be determined by the applicable provisions of this contract such as: the Default clause.... ...

....

(j) Progress Payments to Subcontractors.

....

(2) Subcontracts on which progress payments to subcontractors may be included in the base for progress payments ... are limited to those subcontracts ... in which the provisions regarding progress payments are substantially similar to and as favorable to the Government as this "Progress Payments" clause (except that in the case of those subcontractors which are small business concerns a "Progress Payment" clause substantially similar to 7–104.35(b) may be used).... All rights of the subcontractor with respect to all property to which the Government has title under the subcontract will be made subordinate to the rights of the Government to require delivery of such property to it in the event of default by the Contractor under this contract....

*Id.* at 74–77. The default provisions include the following:

(d) If this contract is terminated as provided in paragraph (a) of this clause [on default of the Contractor], the Government, in addition to any other rights provided for in this clause, may require the Contractor to transfer title and deliver to the Government, in the manner and to the extent directed by the Contracting Officer, (i) any completed supplies, and (ii) such partially completed supplies and materials, parts, ... and contract rights ... as the Contractor has specifically produced or specifically acquired for the performance of such part of this contract as has been terminated, and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in the possession of the Contractor in which the Government has an interest....

*Id.* at 81. The record does not indicate whether these eight pages of Defense Acquisition Regulations were attached to the original contract or to any of the modifications made before Wedtech's purchase order to Pearson's (or even before Modification No. P00094 in May 1986).

No evidence was introduced that the Navy ordered any P–9 pontoons from Wedtech, other than the 80 ordered in Modification No. P00020 and the 64 more in Modification No. P00094.

### B. *Wedtech's purchase order to Pearson's*

Wedtech turned to various others to fulfill its obligations under its contract with the Navy. In 1984 and 1985, Wedtech issued six or so purchase orders to Pearson's.

In March 1985, *see* Gov't Exh. 5, item 7 ("Date of Initial Award/YR 85 MO 3"), around when Wedtech and the Navy made Modification No. P00020 for the delivery of 80 P–9 pontoons, Wedtech and Pearson's orally consummated a sales agreement on numerous items, including 56 P–9 pontoons following the design drawings for the 80 P–9 pontoons in Modification No. P00020.

On May 22, 1985, Wedtech sent Pearson's a 10–page purchase order memorializing the agreement, Purchase Order No. 21413. Wedtech listed the price for the 56 P–9 pontoons at $7,650 apiece for a total of $428,400—eight to be shipped a week between June 16 and July 27, 1985 to Wedtech of Michigan in Ontonagan, Michigan. In the heading for each page of the purchase order appears the typewritten notation "N62472–84–C–3116" in the box la-

belled "Contract Number." Among the provisions typewritten on the purchase order are the following two at issue here:

Progress payments for this P.O. will be governed by and made in accordance with D.A.R. 7–104.35 and D.A.R. E–513.2.

. . . .

Vendor must conform to all applicable Flowdown Clauses as outlined on listing provided with this purchase order. If a listing of Flowdown Clauses is not received with this order, it is the vendor's responsibility to obtain this listing and in all ways to conform to specified requirements prior to acknowledgement of this order.

Accompanying the purchase order was neither a listing of flowdown clauses nor an explanation of the two alphanumeric codes "D.A.R. 7–104.35" and "D.A.R. E–513.2" nor a copy of any Federal or Defense Acquisition Regulations.

During the negotiations between Wedtech and Pearson's, no one from either Wedtech or Pearson's made any mention of or reference to either "flowdown clauses" or "D.A.R." codes. Neither of the two above provisions was included in any of the three or so previous purchase orders that Wedtech had earlier issued to Pearson's. The first notice that anyone from Pearson's had of these two provisions was upon the receipt of Purchase Order No. 21413 from Wedtech.

Pearson's immediately objected to these two unexplained provisions, which Wedtech unilaterally added to the written purchase order. Specifically, Pearson's called Wedtech several times to obtain not only a listing of flowdown clauses, but also an explanation of two clauses, including the reference to "D.A.R." codes. Despite assurances to Pearson's, Wedtech never complied. Finally, on July 15, 1985, Pearson's wrote Wedtech:

As previously discussed with you we have been unable despite repeated and timely efforts to obtain the flowdown clause listing as described in your various purchase orders under contract # N62472–84–C–3116. We discussed with you among others the need for understanding and having knowledge of these clauses before we could concur with our acceptance. Furthermore these clauses are an afterthought to the Purchase Order process in that they were not discussed or even insuiated [sic] during the bid or negotiation stage. Therefore untill [sic] such time as we are able to gain copies of the pertinent portion of the contract and specifically the flowdown clause listing, we totally disclaim any knowledge or responsibility for this portion of your purchase orders.

Should you forthwith make the applicable documents available to us then we will quickly re-evaluate our position.

The letter was no help, for Wedtech still never sent the information.

No direct evidence was presented that anyone from Wedtech, the Navy, or elsewhere gave Pearson's this information or that Pearson's otherwise knew what the referenced flowdown clauses or DAR codes provided or even to what the codes "D.A.R. 7–104.35" and "D.A.R. E–513.2" referred. According to J.W. Pearson, Pearson's president, Pearson's was never provided a copy of any portion of the Navy–Wedtech contract. Further, no evidence was presented that defense subcontractors commonly are aware that the abbreviation "D.A.R." refers to the U.S. Department of Defense's former Defense Acquisition Regulations applicable for defense contracts entered into before April 1, 1984 [3] and found in title 32 of pre–1985 editions of the Code of Federal Regulations.

In sum, the Court finds that Pearson's had no actual knowledge what these flowdown clauses contained or to what the

---

3. *See* 48 Fed.Reg. 42103 (Sept. 19, 1983); *see also* 50 Fed.Reg. 26987 (July 1, 1985), *reprinted in* 32 C.F.R. pts. 1–39, at 9 (1985). The government's sole witness, Marvin Liebman, testified that Wedtech's contract with the Navy was made before the Federal Acquisition Regulations replaced the Defense Acquisition Regulations for defense procurement contracts; this testimony was thus in error.

codes "D.A.R. 7–104.35" and "D.A.R. E–513.2" referred.

Meanwhile, in May 1985, Wedtech and Pearson's amended their sales agreement to provide for the purchase of 80 more P–9 pontoons, or a total of 136 pontoons—still at $7,650 apiece for a total of $1,040,400. The due date for the original 56 pontoons remained the same; the 80 additional pontoons were to be delivered by February 15, 1986. On June 26, 1985, Wedtech sent a written confirmation of this change; the confirmation listed the purchase order number as 21413–01. The confirmation indicated that 40 of the additional pontoons were to be sent to the "N625 Receiving Officer" in Rhode Island and to be "marked for purpose code-D PWRMS. TCN–N62578–5066–X104" and that the other 40 were to be sent to the "N62584 Receiving Officer" in Port Hueneme, California and to be "marked for purpose code-D PWRMS. TCN–N62583–5066–X104." The confirmation also provided that "all other stipulations in the original order remain the same."

Other than this single notation in the shipping instructions, there was no evidence, direct or circumstantial, why Wedtech ordered a total of 136 P–9 pontoons, even though Modification No. P00020 called for only 80 P–9 pontoons. No other evidence, documentary or testimonial, was introduced concerning any defense procurement contracts other than the single one discussed in Part I(A) above.

According to an undisputed tabulation in evidence, the total price for the items under Purchase Order No. 21413, as amended on five instances, equalled $2,494,741. *See* Gov't Exh. 11, at 9.

With the exception of these eighty additional pontoons, the purchase order as amended provided a delivery date sometime in 1985 for each item under the purchase order.

### C. *Performance of the contracts*

In connection with its sale of the 136 pontoons and other items, Pearson's submitted to Wedtech nine progress payment requests for a total of $2,665,105. In general terms, progress payments are periodic payments a buyer makes to a seller during the period the seller is in the process of constructing, or procuring, the items under sale; in this instance, each payment request was for 95% of the costs Pearson's had incurred as of the date of the request.

At Wedtech's request (purportedly to expedite payment), Pearson's submitted its requests on copies of government Form DD 1195, which Wedtech had given it. The form contains the following preprinted certification just above the signature line:

I certify ... that there are no encumbrances (except as reported in writing herewith, or on previous progress payment No. ____) against the property acquired or produced for and allocated or properly chargeable to the contract which would affect or impair the Government's title....

Each request was signed by an authorized Pearson's official. There is no evidence that Pearson's ever reported any encumbrances to either Wedtech or the government. The first two requests were made before Pearson's received the written purchase order from Wedtech and contain no reference to Wedtech's contract with the Navy; the third through ninth requests, made monthly between June 25, 1985 and December 20, 1985, each list the contract number for Wedtech's contract with the Navy.

The nine requests gave the following figures as the "Contract Price": the first three, $2,654,748.20; the fourth, $2,654,749; the fifth and sixth, $2,702,624; the seventh, $2,756,030; the eighth, $2,792,194; and the ninth, $2,801,163. At trial, the Navy's administrative contracting officer for the Wedtech contract, Marvin Liebman, testified that the last figure, $2,801,163, represented the correct final purchase order price between Wedtech and Pearson's, at least as far as the Navy was concerned.

None of the requests contains a reference to a purchase order number for any of the purchase orders between Wedtech and Pearson's. Further, no request indicates what particular items the request concerns; specifically, no request indicates that it

concerns any P–9 pontoons. There was no direct evidence that any of these nine payment requests were directed *solely* to Purchase Order No. 21413 or specifically concerned, in whole or in part, any of the forty P–9 pontoons at issue here.

Wedtech submitted to the government Pearson's progress payment requests—which, to repeat, totalled $2,665,105—as part of Wedtech's own progress payment requests. The government in turn paid $2,665,105 to Wedtech against Pearson's nine progress payment requests. In other words, the government paid Wedtech the full amount that Pearson's had requested as progress payments.

Pearson's received funds totalling $2,562,515 from Wedtech in the form of nine checks that directly correspond to the amounts of Pearson's first eight progress payment requests. Pearson's never received any payment for the ninth progress payment request—which was for $102,591—or any other, remaining amounts due it from Wedtech.

On November 6, 1986, J.W. Pearson, the president of Pearson's, sent Wedtech a letter demanding payment for the $246,853.24 that Pearson's contended Wedtech still owed it under all six or so purchase orders between Wedtech and Pearson's; according to an undisputed tabulation attached to the letter, the total charges to Wedtech equalled $3,919,454.72 and the total payments from Wedtech equalled $3,671,601.48.[4] The letter also advised that Pearson's would be keeping forty of the P–9 pontoons as security until this payment was made.

In the letter, Mr. Pearson wrote: "Perhaps [the forty pontoons], as specific items, have been paid for and perhaps not." Notwithstanding the government's contention, the Court does not find this statement, whether considered alone or together with other evidence, to constitute an admission by Pearson's that it had been paid specifically for any one of these forty pontoons that it refused to deliver to Wedtech or the government. This language ("Perhaps ...

and perhaps not") is too non-committing to be the stuff admissions are made of.

By letter to Wedtech dated December 5, 1986, the government declared Wedtech in default and terminated its contract with Wedtech. By letter to Wedtech dated December 16, 1986, the government demanded all Progress Payment Inventory in the possession of Wedtech and its subcontractors:

> Pursuant to the Default Clause and the Progress Payment Clause (DAR 7–104.35(b)), WEDTECH Corp. is hereby directed to transfer title and deliver to the Government all parts; materials; inventories; [and] work in process ... theretofore acquired or produced by WEDTECH and allocable or properly chargeable to subject contract under sound and generally accepted accounting principles and practices. The transfer of title and delivery to the Government of the parts; materials; inventories; work in process, etc., heretofore cited, shall also apply to all subcontractors, at any tier, who have received subcontractor progress payments.

There is no dispute here that Wedtech was in default.

Within days thereafter, Wedtech filed a voluntary Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Southern District of New York. In April 1987, the government applied to the Bankruptcy Court for relief from the automatic bankruptcy stay, *see* 11 U.S.C. § 362, in order for the government "to take possession of Progress Payment Inventory ... presently in the possession and control of Wedtech Corp. ('Debtor') and Debtor's subcontractors under" the terminated contract; the application specifically listed the forty pontoons, *see* Gov't Exh. 3, at 49 (obverse side); *see also* Gov't Exh. 4, at 42 (reverse side), but no other property, at Pearson's. The government sent Pearson's a notice of its application. By order dated May 5, 1987, the Bankruptcy Court granted the government's application.

---

**4.** Pearson's figure is of $246,853.24 is $1,000 too small: the difference between $3,919,454.72 and $3,671,601.48 is $247,853.24.

Pearson's has never delivered these forty P–9 pontoons. There is, however, no contention or evidence that Pearson's did not deliver all of the remaining items under its several purchase orders. The government has consistently maintained that by the time it declared Wedtech in breach, it already held unconditional title to any item that both was in Pearson's possession and was allocable to Pearson's purchase orders with Wedtech. Yet in its application to the Bankruptcy Court, specifically, its description of the property it contended belonged to it, the government listed no property at Pearson's other than the forty P–9 pontoons at issue here. Thus, by uncontroverted circumstantial evidence, the Court finds that Pearson's did in fact deliver of all these remaining items.

According to Mr. Pearson's uncontradicted trial testimony, Pearson's credited each payment from Wedtech to the oldest outstanding balance due from Wedtech, which had been chronically late in paying Pearson's. There was no direct evidence when these forty pontoons were built relative to any of the remaining items Pearson's built for Wedtech. By four points of circumstantial evidence, however, the Court finds that these forty pontoons were the last items Pearson's built for Wedtech: first, Mr. Pearson's description of his company's accounting methods suggests that it follows a first-in-first-out (FIFO) accounting method, a traditional, see *Commissioner of Internal Revenue v. Joseph E. Seagram & Sons, Inc.*, 394 F.2d 738, 740 (2d Cir.1968), accounting method under generally accepted accounting principles (GAAP) for "clearly reflecting income," see generally *St. James Sugar Co-op., Inc. v. United States*, 643 F.2d 1219, 1223 (5th Cir. Unit A 1981) (discussing 26 U.S.C. § 471); second, the circumstantial evidence establishes that all other items were delivered to Wedtech or the Navy; third, the schedule of delivery dates set forth in Purchase Order No. 21413 has eighty P–9 pontoons as the last items to be delivered under the purchase order; and fourth, Pearson's received its

progress payments covering the period when the first 56 P–9 pontoons were to have been built and delivered by Pearson's.

In the pretrial order, the parties stipulated that Wedtech now owes Pearson's the principal sum of $240,830.57.[5]

The sole evidence, direct or circumstantial, that at least a portion of the moneys Pearson's received was for one or more of the forty pontoons that Pearson's refused to turn over is from the purchase price for these pontoons. At a price of $7650 apiece, Wedtech was to have paid Pearson's $306,000 for these forty pontoons. It thus follows that $65,169.43 (i.e., $306,000–$240,830.57, or a little over the price for 8½ pontoons) of the moneys Pearson's received from Wedtech were for at least some of these forty P–9 pontoons. In light of Pearson's accounting method and the timing when the forty pontoons were built, however, the Court must presume that all other payments Wedtech made to Pearson's were for other items or charges.

### D. *Pearson's and the Bank*

On May 1, 1985, Alice National Bank lent Pearson's over $1 million. In return, Pearson's, among other things, executed a written security agreement wherein it granted the Bank a security interest in its inventory. On May 17, 1985, the Bank perfected this security interest under Texas state law.

In April 1988, the Bank notified Pearson's that Pearson's was in default under the loans and that the forty P–9 pontoons in Pearson's possession would be sold at a public auction. Thereafter, the auction was held at which the Bank purchased the pontoons. The pontoons remain in the Bank's possession.

There is no dispute that this security agreement extended to the forty P–9 pontoons that Pearson's refused to turn over to the government. Nor is there dispute that Pearson's was in default under the loans or that the Bank properly foreclosed on these pontoons.

---

**5.** In their proposed findings of fact, the defendants now contend that the total amount due to Pearson's from Wedtech equals $3,912,431.15

and that the total amount paid to Pearson's by or on behalf of Wedtech equals $3,671,600.58.

## E. *The proceedings*

On May 6, 1987, Pearson's counsel advised the government that Pearson's refused to comply with the government's demand that Pearson's turn over the forty P–9 pontoons to the government.

On July 9, 1987, the government brought the instant civil action against Pearson's for title and possession of the forty P–9 pontoons. After the Bank foreclosed on and took possession of the pontoons, the government amended its complaint to make the Bank an additional defendant.

Pearson's has asserted a counterclaim against the government for negligent or intentional misrepresentations to Pearson's in connection with Pearson's purchase orders with Wedtech. Judge Head severed that issue, to be tried if necessary after the trial on the government's principal claim. *See* Courtroom Minutes of Mar. 23, 1990.

## II.

Because the United States is a plaintiff, the Court has subject matter jurisdiction under 28 U.S.C. § 1345. *Compare United States v. Digital Products Corp.,* 624 F.2d 690 (5th Cir.1980) (a federal district court had jurisdiction to adjudicate the government's action against a prime contractor for title and possession of property being built by the prime contractor for the government) *with Shepard Engineering Co. v. United States,* 287 F.2d 737 (8th Cir.) (not specifically addressing the question of jurisdiction, but addressing the merits of a similar federal district court action by the government against a defense subcontractor), *reh'g denied,* 289 F.2d 681 (8th Cir.1961) (per curiam).

Because both defendants reside in this district and alternatively because the claim arose in this district, venue is proper under 28 U.S.C. § 1391(b).

■ For three independent reasons, the Court rules against the government.[6] First, the Defense and Federal Acquisition Regulations do not, by operation of federal law without more, grant the government title to or the right of possession in any property held by a subcontractor for ultimate use by the government. Second, Pearson's did not agree that the government would have title to or the right of possession in any pontoons Pearson's was building for the purchase order with Wedtech. Third, the government did not establish that, if Wedtech had not breached its contract with the government and its purchase order with Pearson's, the government would have ultimately gained title and possession of the forty specific pontoons at issue here. The Court explains.

### A.

■ The government first asserts its broadest argument: whenever a person agrees to supply any goods to a prime contractor with the Navy or other federal defense agency, then the federal government by operation of federal law holds unconditional title to all such goods, whether or not the supplier has delivered the goods, has been fully paid for the goods, or has contracted directly with the federal government and irrespective of any state law or any agreement between the supplier and the prime contractor.

While the government cites a host of cases,[7] none applies here. In each of those

---

**6.** The Court must dispose of one further argument by the government. In its post-trial brief, the government asserts for the first time that the Bankruptcy Court's order constituted *res judicata* that the government has title to and the right of possession in the forty pontoons. *See* R.Doc. 57, at 7. First, the government waived this procedural claim by asserting it in neither its pleadings, the joint pretrial order, nor its pretrial briefs. *See Pillsbury Co. v. Midland Enterprises, Inc.,* 715 F.Supp. 738, 762 & n. 63 (E.D.La.1989) (Carr, J.), *aff'd,* 904 F.2d 317, 318 (5th Cir.1990); *cf. Simon v. United States,* 891 F.2d 1154 (5th Cir.1990). Second, the doctrine

is inapplicable, for the Bankruptcy Court did not purport (and it is questionable whether it would even have had the jurisdiction) to resolve a title dispute where the bankruptcy debtor, Wedtech, was not a party to the dispute. That the government brought the instant action instead of merely asking the Bankruptcy Court to "enforce" its order further betrays the fallacy of this late-made procedural claim.

**7.** *See United States v. Ansonia Brass & Copper Co.,* 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910); *In re American Pouch Foods, Inc.,* 769 F.2d 1190 (7th Cir.1985) (2–1), *cert. denied sub*

cases, the person with possession of the property at issue had a direct, prime contract with the government and had agreed in that contract that "title" would "vest" in the government not merely upon delivery of the property to the government, but earlier upon that person's acquisition or production of the property; in each of those cases, this contractual "title" provision was held to entitle the government to relief against its prime contractor. Here, in contrast, Pearson's and the government were not parties to the same contract. Simply put, Pearson's is not a prime contractor. *See Dowty Decoto, Inc. v. Department of Navy,* 883 F.2d 774, 777 (9th Cir.1989); *cf. In re Murdock Machine & Engineering Co. of Utah,* 620 F.2d 767, 770–73 (10th Cir.1980) (where unbeknownst to a supplier of steel bars, the buyer sought the bars to fulfill its government defense contract that contained the typical title vesting clause, the government was not entitled to take possession of the bars, on which the supplier had rightfully stopped delivery due to the buyer's insolvency).

Citing *Shepard Engineering Co. v. United States,* 287 F.2d 737 (8th Cir.1961), the government asserts that the general rule enunciated in its host of cases above extends to subcontractors such as Pearson's. As the defendants correctly explain, *see* Defendants' Supplemental Trial Brief, R.Doc. 55, *Shepard* likewise does not apply. Unlike the forty pontoons here, the property at issue in *Shepard* had come from the prime contractor; by virtue of the earlier contractual agreement between the government and the prime contractor, title to that property lay with the government and not the prime contractor. Thus, in temporarily transferring the property to the subcontractor so that it could do work on the property, the prime contractor did not, as it by that time could not, change the government's ownership rights in the property.[8] *Accord United States v. Lindberg Corp.,* 686 F.Supp. 701, 703 (E.D.Wis.1987), *aff'd,* 882 F.2d 1158, 1161–62 (7th Cir.1989).

The federal "law" upon which the government relies is the title vesting provision for small businesses in former Defense Acquisition Regulation 7–104.35(b), commonly called the "progress payment" clause and quoted on page 5 above. For three main reasons, the Court concludes that this provision does not reach as broadly as the government suggests. First, the federal statutes under which this regulation (like its replacement, Federal Acquisition Regulation 52.232–16, *compiled in* 42 C.F.R. ch. 1) was promulgated, namely, 10 U.S.C. § 2307 and 41 U.S.C. § 255, do not provide that, irrespective of what terms may be in either the prime contract or the subcontract, the government obtains an interest in property to be built by the subcontractor even before the prime contractor may obtain an interest in that same property. These statutes give the contracting agency the discretion to determine the form of security the agency may require of the *prime* contractor as a condition for the *prime* contractor's receiving progress payments; these statutes are wholly silent on requiring or deeming that a subcontractor give the government any interest in proper-

*nom. American Pouch Foods, Inc. v. United States,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986); *United States v. Digital Products Corp.,* 624 F.2d 690 (5th Cir.1980); *In re Double H Products Corp.,* 462 F.2d 52 (3d Cir.1972); *In re American Boiler Works, Inc.,* 220 F.2d 319 (3d Cir.1955); *In re Wincom Corp.,* 76 B.R. 1 (Bankr.D.Mass.1987); *In re Reynolds Manufacturing Co.,* 68 B.R. 219 (Bankr.W.D.Pa.1986); *In re Economy Cab & Tool Co.,* 47 B.R. 708 (Bankr. D.Minn.1985).

These cases represent the majority view (and, with *Digital Products,* the controlling authority within the Fifth Circuit) as between the government and its defense prime contractors, but a minority of forceful opinions suggests to the

contrary that the government merely obtains the status of an equitable lien holder. *See Marine Midland Bank v. United States,* 231 Ct.Cl. 496, 687 F.2d 395 (1982) (following in part *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983); *First National Bank of Geneva v. United States,* 13 Cl.Ct. 385 (1987).

**8.** *Shepard* does not apply for a second reason. The subcontractor in that case expressly agreed to the terms and conditions of the prime contract between the prime contractor and the government. *Id.* at 738. As explained further in Part II(B) below, Pearson's did not so agree.

ty intended to be sold to a prime contractor for ultimate use by the government. Second, the Defense Department regulations under the statutes similarly leave use of particular "progress payment" clauses to the discretion of the government contracting officers. *See* Defense Acquisition Regulation E-504.1; *cf. Universities Research Ass'n v. Coutu*, 450 U.S. 754, 783 n. 38, 101 S.Ct. 1451, 1468 n. 38, 67 L.Ed.2d 662 (1981). Third, this title vesting provision, which is set forth in paragraph (d) of the regulation, speaks solely of property acquired or produced by, that is, in the possession of, the prime contractor and does purport to extend to property not yet delivered to the prime contractor. The government suggests that the provision applies to any property "allocable" to the prime Navy contract and argues that once Pearson's sought payments from Wedtech for the forty pontoons, these pontoons were "allocable" to Wedtech's Navy contract; this argument must fail, for it ignores the full text of the title vesting provision: not only must the property at issue be "allocable or properly chargeable to" the Navy contract, but also it must be "acquired or produced by" the prime contractor, here Wedtech.

Nor does paragraph (j) of the regulation, entitled "progress payments to subcontractors," provide that the title vesting provision in paragraph (d) equally applies to subcontractors. Paragraph (j) merely provides that in order for the prime contractor to receive progress payments from the government for amounts that include any subcontractor's progress payment requests to the prime contractor, the prime contractor must have the subcontractor agree to an analogous title vesting provision in favor of the government. The ultimate decision whether any analogous title vesting provisions by the subcontractor in favor of the government are to be included in the subcontract rests with the prime contractor. *See id.* E-513, E-513.2; *accord* Federal Acquisition Regulation 32.504. While a Naval contracting officer may have erroneously authorized progress payments to

Wedtech that included amounts to cover separate progress payment requests by Pearson's to Wedtech, any such improper payment by the government is insufficient to boost the government's position that it obtained title irrespective of any agreement by Pearson's or Wedtech; a government functionary cannot wrest a private person of his property where neither the statute nor the regulations under which the functionary operates give him such authority.

Congress or the Secretary of Defense perhaps could provide that the government automatically obtains an interest in certain property of a person who deals with a prime contractor for the Department of Defense, irrespective of what the subcontractor may know or not know about the relationship between the government and the prime contractor. But they have not.[9]

In sum, for the government to obtain an interest in property as here retained by a subcontractor for reason of non-payment by the prime contractor, the subcontractor must at a minimum formally agree to grant the government such a contractual right. Thus, the Court turns to the direct contract between the Navy and Wedtech on the one hand and the purchase order between Pearson's and Wedtech on the other.

### B.

Contrary to the government's supposition, the record does not establish that either Defense Acquisition Regulation 7-104.25(b) or Federal Acquisition Regulation 52.232-16 was made a part of the direct contract between the Navy and Wedtech in March 1985, when Pearson's and Wedtech consummated their agreement to Purchase Order No. 21413, or in May 1985, when these two consummated their amendment concerning the eighty additional P-9 pontoons of which the forty at issue here are a part.

The government failed to provide the Court a complete copy of the entire contract between the Navy and Wedtech, in-

---

**9.** Of course, the just compensation clause of the Fifth Amendment would require that the

government pay for this sovereign's privilege.

cluding the over-ninety modifications to the original contract. The Court must thus presume that the missing portions do not provide terms favorable to the government in this regard. The original contract apparently did not incorporate any Defense or Federal Acquisition Regulations on "title" or "progress payments" among its express terms, nor did the first modification in the record, Modification No. P00020, concerning the order for eighty P–9 pontoons to be constructed by Pearson's. According to the record, the first modification containing any reference to these regulations was Modification No. P00064, which was not made until over six months after Wedtech made its purchase order with Pearson's; further, the text incorporating these regulations did not purport to apply the regulations to any of the other modifications or to the original contract.

While Government Exhibit 1 contains a copy of Defense Acquisition Regulation 7–104.35(b), there is no evidence that this copy was attached to the original contract or to any of the modifications thereto made—or more generally that Wedtech agreed to the terms of the discretionary regulation—before Wedtech and Pearson's consummated their purchase order.

Because the government failed to establish that even Wedtech agreed to such a regulation anytime before November 1985, any conclusion or presumption that Pearson's agreed to be bound by the terms of the direct contract between Wedtech and the Navy would be immaterial.

Of course, whether or not a direct contract between the Navy and a prime contractor contains any title vesting provisions, a subcontractor is not precluded from independently agreeing with the prime contractor to similar, third-party-beneficiary provisions in favor of the government. For four principal reasons, however, the Court concludes that Pearson's did not so agree in this instance.

First, as indirectly suggested in Part II(A) above, the terms of Defense Acquisition Regulations 7–104.35(b) and E–513.2 do not of themselves provide for title vesting by a subcontractor in favor of the government. Thus, whether or not Pearson's acquiesced to the first of the two provisions Wedtech unilaterally added to its written confirmation of Purchase Order 21413 ("Progress payments for this P.O. will be governed by and made in accordance with D.A.R. 7–104.35 and D.A.R. E–513.2."), this provision is insufficient for concluding that Pearson's agreed to immediate title vesting in favor of the government for the forty pontoons. In other words, this provision is insufficient to constitute an agreement different from the standard rules under general commercial law on the passage of title between a seller and buyer of goods. *See* U.C.C. § 2–401(2) ("Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods."). While the dispute at issue here concerns an area of "uniquely federal" interest, *see Boyle v. United Technologies Corp.*, 487 U.S. 500, 506–09, 108 S.Ct. 2510, 2515–16, 101 L.Ed.2d 442 (1988), there appears no basis for not following this general commercial expectation, where the Defense Department regulations explicitly leave it to a private person, namely, the prime contractor, whether or not to require a subcontractor to agree to title vesting provisions in favor of the government.

Second, the two provisions Wedtech unilaterally added to its written confirmation of Purchase Order 21413 never become a part of the purchase order, at least to the extent the two provisions might constitute title vesting provisions by Pearson's in favor of the government. Under U.C.C. § 2–207(2)(b), additional terms set forth in a written confirmation of a contract for the sale of goods, even between merchants, do not become a part of the contract if "they materially alter it." A title vesting provision in favor of the government would deprive Pearson's of, among other remedies, the remedy under U.C.C. § 2–703(a) to withhold delivery of goods where "the buyer wrongfully ... fails to make payment due on or before delivery ... with respect to a part or the whole." Thus, the addition of a title vesting provision would materially

alter a prior agreement that did not include such a provision.

Third, any "flowdown clause" that might have in effect constituted a title vesting provision by Pearson's in favor of the government [10] did not become a part of the purchase order. Under U.C.C. § 2–207(2)(c), additional terms set forth in a written confirmation of a contract for the sale of goods, even between merchants, do not become a part of the contract if "notification of objection to them … is given within a reasonable time after notice of them is received." Pearson's immediately objected to the inclusion of any "flowdown clause" where as here Wedtech had failed to provide Pearson's a copy of the clause; after Wedtech failed to comply with its promise, Pearson's wrote Wedtech to the same effect. Noting further, the pre-existing long-term relationship between Wedtech and Pearson's, the Court concludes that Pearson's phone calls and letter together constituted "notification of objection … within a reasonable time."

Fourth, the certification in the various progress payment requests by Pearson's to Wedtech constitutes no evidence of a title vesting provision by Pearson's to the government. To hold otherwise begs the issue whether Pearson's agreed to such a provision. Because the Court concludes that the government has never had any title to the forty pontoons, the certifications were accurate, notwithstanding the Bank's security interest in Pearson's inventory. Further, that a subcontractor requested and received progress payments in no way implies that the subcontractor agreed to vest title to the government on any property under the subcontract.

### C.

■ Finally, even if Pearson's had agreed that government would have title to all items that were under Pearson's purchase orders on the one hand and allocable to a prime contract between Wedtech and the Navy on the other, the government failed to establish that the forty specific P–9 pontoons at issue here were allocable to any such Navy contract.

The sole such prime contract in the record is Contract No. N62472–84–C–3116. As of the time when Wedtech ordered the total of 136 P–9 pontoons from Pearson's (that is, as of May or June 1985), Wedtech's Navy contract as modified called for only eighty P–9 pontoons. While the record indicates the Wedtech and the Navy modified their prime contract to provide for an additional 64 P–9 pontoons, that subsequent modification was not made until May 1986, over three months after the last P–9 pontoons from Pearson's were to have been delivered.

The Court finding that Pearson's delivered all the various items under its several purchase orders except the forty P–9 pontoons at issue here, it follows that Pearson's delivered, among other items, 96 P–9 pontoons. Further, in light of the Bankruptcy Court's possession order as against Wedtech itself, there is no basis to presume that the Navy did not receive any P–9 pontoons that Pearson's delivered to Wedtech instead of directly to the Navy. Because the Navy contract as it existed before May 1986 only called for only eighty such pontoons, the government received, at a minimum, what the evidence here shows it bargained for, eighty P–9 pontoons.

As the shipping instructions for the forty P–9 pontoons at issue here show, the 56 P–9 pontoons that Wedtech ordered beyond the eighty called for under its prime contract with the Navy were, most likely, also intended by Wedtech to be bought for ultimate use by the Navy. In the absence of further evidence, however, it would be speculation for the Court to presume that Wedtech was not merely taking a business risk anticipating that the Navy would be wanting more than eighty P–9 pontoons, but instead already had a contractual

---

**10.** The government has still never explained exactly what a "flowdown clause" provides in this context. The sole instances where the term "flowdown," "flow down," or "flow-down" appears in the Federal Acquisition Regulations do not address the issue of title to property. *See* Federal Acquisition Regulation 217.7403(a)(3), 225.603(b)(1)(iv), 244.304(b)(1)(v), 244.-304(b)(4), 252.227–7037(j).

agreement with the Navy that the Navy wanted or would take these additional pontoons.

Because the Court concludes that the Navy received all eighty P–9 pontoons that the Navy was ultimately to receive from Pearson's, it is immaterial that Wedtech may have paid the full price for eight of the remaining forty pontoons. While Wedtech's bankruptcy trustee may or may not have a valid claim for recovery or reimbursement for eight of these pontoons, the government has not established that it has standing to assert such a derivative claim on behalf of Wedtech or its trustee.

### III.

As Justice Holmes warned: "Men must turn square corners when they deal with the Government." *Rock Island, A. & L.R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). If the government is to inspect beds, however, it must at least be invited into the bedroom. Because Pearson's offered no such invitation to the government, the government cannot complain.

For these reasons, the Court dismisses the government's claims on the merits. Under F.R.Civ.P. 54(d) and 28 U.S.C. § 2412(a), the Court determines that the government should bear all court costs on these claims.[11] Because the counterclaim still remains (and is to be ruled upon by Judge Head) and no party expressly requested the Court to enter judgment pursuant to F.R.Civ.P. 54(b) upon the issuance of its ruling on the government's claims, the Court does not enter judgment on the government's claims at this time.

---

**11.** Neither side has specifically addressed whether the defendants are entitled to attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1). Thus, the Court likewise does not address the issue here.